**AMERICAN GEOPHYSICAL UNION, El-sevier Science Publishing Co. Inc., Per-gamon Press, Ltd., Springer–Verlag, GmbH & Co., K.G., John Wiley & Sons, Inc. and Wiley Heyden, Ltd., on behalf of themselves and others similarly situated, Plaintiffs and Counterclaim Defendants,**

v.

**TEXACO INC., Defendant and Counterclaim Plaintiff.**

No. 85 Civ. 3446(PNL).

United States District Court, S.D. New York.

July 23, 1992.

Modified July 24, 1992 and July 28, 1992.

Opinion and Order on Allowance of Request for Immediate Appeal Oct. 26, 1992.

Proskauer Rose Goetz & Mendelsohn (Stephen Rackow Kaye, Jon A. Baumgarten, James F. Parver, Christopher A. Meyer, Karen E. Clarke, Christopher Collins, Mazelle Hedaya, of counsel), New York City, for plaintiffs and counterclaim defendants.

Kaye, Scholer, Fierman, Hays & Handler (Milton J. Schubin, Thomas A. Smart, Rich-

ard A. De Sevo, of counsel), New York City, Joseph P. Foley, Texaco Inc., White Plains, N.Y., for defendant and counter-claim plaintiff.

## OPINION AND ORDER

*Findings of Fact and Conclusions of Law*

LEVAL, District Judge.

### I.

This class action tests the question whether it is lawful under the U.S. Copyright Act, 17 U.S.C. § 101, *et seq.*, for a profit-seeking company to make unauthorized copies of copyrighted articles published in scientific and technical journals for use by the company's scientists employed in scientific research. The plaintiffs are publishers of scientific and technical journals that publish copyrighted material under assignment from the authors. The defendant is Texaco Inc., one of the largest corporations in the United States, which engages in all aspects of the petroleum business from exploration through transportation and refining to retail marketing. This opinion decides the limited issue whether the making of single copies from plaintiffs' journals by a Texaco scientist is fair use under Section 107 of the Copyright Act of 1976. 17 U.S.C. § 107. Many of the facts are not seriously disputed.

*Texaco's Scientific Research.* Texaco engages in substantial scientific research directed toward improving Texaco's products and developing new products and processes. Texaco employs between 400 and 500 scientists and engineers at six research centers in the United States, including one in Beacon, New York. It spends in excess of $80 million annually in carrying on scientific and technical research, including an average of approximately $37 million a year from 1985 to 1987 at the Beacon facility.

To support its research activities, Texaco subscribes to numerous scientific and technical journals, some published by various of the plaintiffs, and maintains large libraries of such materials. Texaco scientists, on learning of an article that may be helpful or important to their research, regularly make (or cause to be made by Texaco's research libraries) a photocopy to be read, kept in their personal files and used in the laboratory in the course of their research work.

*Use of Journals in Research: Photocopying.* Learned journals play an important part in scientific research. They serve to disseminate broadly and with reasonable rapidity the results of scientific research being conducted in many places. It is of great importance for scientists doing research to keep abreast of the publication of such articles for many reasons. The reasons include awareness of new learning, suggestion of new ideas and approaches, avoidance of duplication of experimentation that has already been done, avoidance of avenues of experimentation that have been demonstrated to be fruitless, adoption for productive research of findings that have resulted from the research of others, and other valuable uses too numerous and varied to mention.

Because it is the important for scientists to remain abreast of such publications, industrial corporations that engage in research use a variety of methods to keep their scientists aware. Among the methods used are purchasing subscriptions to such journals and routing of the newly published issues among the scientists, circulating summaries or indices of recently published studies, circulating photocopies of tables of contents of recently published issues of journals, and simple word of mouth by which scientific co-workers mention to one another recent publications of interest.

It is commonplace for scientists employed at Texaco, and in industry generally, to make for themselves (or to request from the company library) photocopies of particular articles that are expected to be useful in their work. There are numerous reasons for the use of such photocopies. Most importantly, it frees the original journal to circulate among colleagues or to return to the library and permits numerous scientists to keep copies of the same mate-

rial, or of material bound in the same volume. Photocopying also permits scientists to make and maintain easily referenced personal files of pertinent articles, instead of surrounding themselves with bulky original volumes that include much material that is not relevant for the particular researcher. It avoids the need for repeated trips to the library. It eliminates the risk of error that enters into transcription; it permits a scientist initially to simply file the copy in an appropriate subject file for later review instead of immediately studying the article in detail and taking notes; copies of the article can be taken into the laboratory for use in conducting or evaluating experiments without the risks of errors in transcription and in the misapplication of equations or data; when used in the laboratory, copies eliminate the risk that chemicals or equipment might destroy the original; copies are more conveniently taken home to be read; the reader can make marginal notes directly on copies without defacing the original.

Plaintiffs contend that by this photocopying Texaco infringes the plaintiffs' copyrights. In answer to the complaint, Texaco raises the defense, among others, of "fair use." It contends that such photocopying by scientists in industry is a reasonable and customary practice, necessary to the conduct of scientific research, and that it does not infringe the publishers' copyrights. The parties have stipulated that, prior to the trial of any other issues, trial would be submitted to the Court on a written record limited to the question of fair use under § 107. *See* Procedural and Scheduling Stipulation and Order Governing the Fair Use Trial, entered July 26, 1990.

*Donald Chickering, II, Ph.D.* For convenience and to avoid untoward discovery expenses with respect to largely duplicative matters, the stipulation provides that the

trial of the issue of fair use be conducted with respect to eight photocopies found in the files of an arbitrarily selected one of Texaco's several hundred scientific researchers.[1] The lot fell on one Donald H. Chickering, II, Ph.D., employed at the Texaco research center at Beacon, New York. Chickering's files were found to contain a number of photocopies of numerous items from various scientific and technical journals. As the subject of this limited issue trial, plaintiffs selected eight copies of complete pieces that appeared in the *Journal of Catalysis*, a monthly publication of Academic Press, Inc., which is one of the plaintiffs in this action.

Chickering is a Ph.D. in chemical engineering who specializes in the study of catalysts and catalysis. Catalysis is "the change in the rate of a chemical reaction brought about by often small amounts of a substance that is unchanged chemically at the end of the reaction." *Webster's Third New International Dictionary* 350 (1976). Chickering has been employed at the Beacon research facility since January 1981 as a "technical man at the bench," that is, a professionally degreed scientist who designs and performs experiments and other work in the laboratory. Chickering's laboratory experiments have involved basic research on catalysis, including investigating various ways of analyzing catalysts, designing, building and operating chemical reactors, using catalysts to make usable products out of previously wasted hydrogen and carbon monoxide, and upgrading the quality of fuels through catalysis. At the time of his testimony, Chickering was the group leader of the "Automation Design and Construction Group," which provided engineering and automation research to support catalysis research, new technology research, and advanced research.

---

1. This fair use "test case" trial is potentially dispositive of plaintiffs' entire case because the parties agreed that (after all appeals and certiorari or all opportunities to appeal or seek certiorari are exhausted) if Texaco's claims of fair use are sustained as to each of the eight articles specified, then all of the claims of copyright infringement shall be dismissed with prejudice. *See* Stipulation and Order Re: Background

Facts and Other Matters, dated January 7, 1991, ¶ 3. However, the parties also agreed that if Texaco should lose on its fair use defense with respect to any or all of the eight articles, it remains free, with respect to those articles, to contest other elements of plaintiffs' infringement claims and to pursue any other defenses it has asserted, or may be given leave to assert, to the claims of copyright infringement. *Id.* ¶ 5.

Shortly after Chickering joined Texaco, he had the library at Beacon put his name on the routing lists for the scientific and technical journals that he believed would be of professional interest. Consistent with what Texaco contends is reasonable and customary for scientists employed by for-profit companies, Chickering often photocopied, or had the library photocopy for him, copyrighted articles in scientific and technical journals.

As noted, plaintiffs selected from Chickering's files eight copies of material from Academic Press' *Catalysis*. These included four "articles," two "notes" and two "letters to the editor." [2] Each of them was published with a copyright notice showing Academic Press as the owner of the copyright and reserving all reproduction rights. It is assumed for purposes of the trial of the fair use issue that each was indeed copyrighted matter and that the copyright had been validly assigned by the authors to Academic Press.

In each case Chickering photocopied the entirety of the particular article, note or letter. He selected those pieces because the discussion was pertinent to research that he was conducting or expected to conduct in the future and because he expected that the discussion and the information conveyed would be helpful to him in conducting research for Texaco. Although Texaco's papers and the affidavits of its personnel repeatedly refer to Chickering's use of these materials as his "personal" use, it is clear that this refers to research pursuant to Chickering's employment for the benefit of his employer Texaco.

*Academic Press and the Journal of Catalysis.* Academic Press, the publisher of *Catalysis*, is a major publisher of scholarly scientific, technical and medical journals, monographs and books. Academic Press is a wholly-owned subsidiary of Harcourt Brace Jovanovich, Inc., the nation's largest scientific and medical book and journal publisher. Currently, Academic Press publishes 105 scientific, medical and technical journals covering a wide range of specialties in the physical, life and behavioral sciences.

*Catalysis* first appeared in 1962. It is published monthly. It includes three classes of items: articles, notes and letters to the editor. They vary in form and size, articles being the longest, letters to the editor the shortest. (Because there is no functional distinction between the three for purposes of this inquiry, they are all referred to here as "articles.") All articles in the journal are devoted to scientific and technical matters. Each monthly issue is around 200 pages long and contains approximately 20–25 articles.

Every article published in *Catalysis* is unsolicited; none is written by Academic Press employees. Academic Press does not pay authors for the right to publish an article. Authors interested in publishing in *Catalysis* are directed to submit their articles directly to one of the journal's two editors. Authors are informed that if their manuscript is accepted for publication, the copyright in the article, including the right to reproduce the article in all forms and media, shall be assigned to Academic Press.

The editors are not employees of Academic Press, and, like the authors, they receive no pay. Academic Press reimburses the editors for secretarial support, postage, telephone charges and some travel expenses. The editors have complete edito-

---

**2.** They are as follows: (1) P. Lee, et al., *Adsorption–Desorption Kinetics of H2 From Supported Nickel Catalysts*, 73 J. Catalysis 272 (1982); (2) E. Tronconi, et al., *Experimental Criteria for Diffusional Limitations During Temperature–Programmed Desorption From Porous Catalysts*, 93 J. Catalysis 197 (1985); (3) D. Jones, et al., *Saturation Effects in Temperature–Programmed Desorption Curves*, 80 J. Catalysis 40 (1983); (4) I. Carrizosa, et al., *The "Shape Index" of Temperature–Programmed Desorption Curves*, 52 J. Catalysis 547 (1978); (5) J. Criado, et al., *Remarks on "Temperature–Programmed Desorption From Porous Catalysts: Shape Index Analysis"* 75 J. Catalysis 428 (1982); (6) R. Demmin, et al., *Temperature–Programmed Desorption From a Packed Bed*, 90 J. Catalysis 32 (1984); (7) R. Gorte, *Design Parameters for Temperature–Programmed Desorption From Porous Catalysts*, 75 J. Catalysis 164 (1982); (8) M. Vannice, *The Influence on the Support on the Catalytic Behavior of Ruthenium in Co/H2 Synthesis Reactions*, 63 J. Catalysis 255 (1980).

rial control and sole discretion over the content of *Catalysis.* Articles they deem worthy of publication are submitted to peer review for a recommendation as to whether the article should be published, and if so, whether and how the article should be revised. The peer reviewers are not paid by Academic Press.

Academic Press sells two types of subscriptions to *Catalysis:* an institutional rate, which is charged to both profit and nonprofit institutions, and an individual rate. In 1989, an institutional subscription to *Catalysis* cost $828. The individual rate is half the institutional rate. The subscription rates have increased since 1972 at a rate more than three times the increase in the Consumer Price Index.

Texaco's Beacon facility, which pays the institutional rate, had purchased one subscription to *Catalysis* until 1983, when it doubled its subscriptions. In 1988, the Beacon facility increased its subscriptions to three, the number it continues to purchase to date.

In addition to yearly subscriptions, Academic Press offers back issues of *Catalysis* for sale. Back issues are available separately for three years following publication. Thereafter, they are bound together as annual volumes and are offered only in that form. In addition, reprints are available, with the author's prior approval, but only on a minimum order of 100 copies. Each order for reprints is printed separately and takes an average of three weeks to be filled.

*The Copyright Clearance Center: Authorizations to Copy.* Academic Press also offers users authorization to photocopy pieces from *Catalysis* through the mechanism of the Copyright Clearance Center Inc. ("CCC"). The CCC is a nonprofit, central clearing-house established in 1977 by publishers, authors and photocopy users which, as agent for publishers, grants blanket advance permission for a fee to photocopy copyrighted material reg-

istered with CCC, and forwards the fees collected to copyright owners, net of service charge. CCC was formed in response to a Congressional recommendation that an efficient mechanism be established to license photocopying. *See* S.Rep. No. 983, 93d Cong.2d Sess., at 122 (1974); H.R.Rep. No. 83, 90th Cong., 1st Sess., at 33 (1968); S.Rep. No. 94-473, 94th Cong., 1st Sess., at 70-71 (1975); *see generally* A.F. Spilhaus, *The Copyright Clearance Center,* 9 Scholarly Pub. 143 (1978). CCC's Board of Directors is comprised of representatives from the publishing, author and photocopy-user communities. As of 1990, approximately 8,000 domestic and foreign publishers had registered approximately 1.5 million publications with CCC.

Currently, CCC offers two principal services for obtaining advance permission to photocopy copyrighted material that publishers have registered with the CCC.[3] The first method, inaugurated in 1978, is called the Transactional Reporting Service ("TRS"). TRS provides photocopy users with blanket permission to photocopy from any CCC-registered publication, provided the user subsequently reports the making of the photocopy and pays the fees required by the copyright owner. The fee is printed on the first page of each article. The fee for each copy of an article in *Catalysis* has been $2 from 1978 through 1982 and $3 thereafter.[4] Under TRS, users originally reported their photocopying to CCC either by (1) submitting an extra copy of the first page of the article or journal that was photocopied, with certain information marked on it; or (2) by submitting log sheets containing the same information; or (3) by providing such information in computer printout form or magnetic tape. Users, however, objected to identifying the articles they copied because they feared this could give information to their competition as to where their research efforts were being concentrated. Accordingly, CCC eliminated the need to identify the item copied. Since January 1, 1983, the

---

**3.** Two additional services are currently under development. *See* footnote 21 *infra.*

**4.** CCC's standard service charge per reported article is 25 cents for articles published prior to January 1, 1983, and 50 cents for articles published after January 1, 1983.

information provided to CCC has been reduced to the journal's standard International Standard Serial Number ("ISSN"), publication year, and the photocopy permissions fee set by the publisher (multiplied by the number of copies made). (The necessary information is set forth at a lower corner of the first page of each article in the journal.)[5] To comply with TRS, a user company might place log sheets at photocopy machines. Whenever company personnel made copies of material covered by CCC, they would make a log entry noting the journal number and year, the numbers of pages and of copies, and the fees prescribed. Library personnel would collect these logs and submit them monthly to CCC with payment.

Some major corporate users objected to the administrative costs of training personnel and setting up recordkeeping necessary for full compliance with TRS. Jane C. Ginsburg, *Reproduction of Protected Works for University Research or Teaching*, 39 J. Copyright Soc'y 181, 209 (1992) (hereinafter "Ginsburg, *Reproduction of Protected Works*").[6] In response, in 1983, CCC inaugurated a second service for obtaining advance permission to photocopy that eliminated the TRS's reporting requirements. This was the Annual Authorization Service ("AAS"). AAS was designed by two econometricians working with the cooperation of major corporate users. Under the AAS, the corporate user is granted a blanket annual license to make photocopies for internal use of any copyrighted material contained in any of the journals and books registered with the

CCC. The annual license fee is determined on the basis of a limited photocopying survey, factored by the licensee's employee population and the copying fees for the journals regularly copied by that user. Upon payment of an annual license fee, the AAS licensee is authorized to make unlimited numbers of photocopies from CCC registered publications for internal use. The license is for one year, renewable for an additional year at the licensee's option. At the end of a two-year period a new license can be obtained.

The revenue derived from the TRS and the AAS is allocated among the publishers that have registered publications with the CCC, net of CCC's service charges, in accordance with the users' photocopying of their material. The basic fee for photocopying per unit of material is not set by CCC but rather by the individual publishers.

As of January 1991, there were approximately 400 users reporting under the TRS method, and over 100 corporate licensees under the AAS method. The AAS licensees include eleven major petroleum companies (Exxon, Mobil Oil, Amoco, Ashland Oil, BP America, Chevron, Marathon Oil, Atlantic Richfield, Occidental Petroleum, Phillips Petroleum, and Sun Refining and Marketing) as well as other major research-oriented corporations including Allied Signal, Ciba–Geigy, AT & T and its Bell Labs Division, Dupont, Eastman Kodak, Dow Corning, General Electric, IBM, Monsanto, Olin, PPG, Polaroid, Texas Instruments,

---

**5.** Each issue of *Catalysis* also contains a masthead statement asserting:

> No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the copyright owner.

> The appearance of the code at the bottom of the first page of an article in this journal indicates the copyright owner's consent that copies of the article may be made for personal or internal use, or for the personal or internal use of specific clients. This consent is given on the condition, however, that the copier pay the stated, per copy fee through the

> Copyright Clearance Center, Inc. ..., for copying beyond that permitted by Sections 107 or 108 of the U.S. Copyright Law. This consent does not extend to other kinds of copying, such as copying for general distribution, for creating new collective works, or for resale. Copy fees for pre–1982 articles are the same as those shown for current articles.

**6.** Few large corporations have employed the TRS. *See* Joseph F. Alen, *New Photocopying License Service Announced*, 6 CBE Views 5 (1983). The TRS service is used primarily by document delivery services and small businesses. Stanley M. Bensen and Sheila Nataraj Kirby, *Compensating Creators of Intellectual Property: Collectives That Collect* 49 (1989) (hereinafter "*Collectives That Collect*").

3M, Union Carbide, United Technologies and USX. As of December 31, 1989, total permission fees paid to CCC under the TRS program from its inception have amounted to approximately $9 million. Total fees paid by licensees under the AAS program from its inception to December 31, 1989 have amounted to about $18 million. CCC's combined TRS and AAS revenue and distributions have increased each year.[7]

## II.

### Copyright Protection and the Doctrine of Fair Use

The copyright entered the law of England through the Statute of Anne of 1710. 8 Anne, ch. 19 (1710). Its caption declared it to be "An Act For the Encouragement of Learning by Vesting the Copies of Printed Books in the Authors. . . ." The preamble declares the statute's purpose to be "for the Encouragement of Learned Men to Compose and write useful Books." The act conferred the exclusive right (for 14 years) to the making of copies upon the authors and noted that the practice of pirated publications "too often [causes] the Ruin of [authors] and their Families."

■ Following a similar line of reasoning the United States Constitution conferred the power on Congress "To promote the progress of science and useful arts by securing for a limited time to authors and inventors the exclusive right to their respective writings and discoveries." U.S. Const. art 1, § 8, cl. 8. The stated objective was "to promote the progress of science [i.e., knowledge]"; the means by which this was to be accomplished was the granting to authors of exclusive rights with respect to their writings. The theory espoused by this constitutional provision is that the advancement of public good, through growth of knowledge and learning, is to be obtained by securing the private commercial interests of authors. See Mazer v. Stein, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954). If authors are guaranteed the opportunity to profit from their writings, they will have an incentive to create, and the public will ultimately reap the resulting expansion of human knowledge. In contrast, if no copyright protection were granted and others were permitted to copy freely works of authorship, authors would find it difficult to earn a living from their writings; their energies would be diverted to other pursuits by the need to feed their families; consequently, the public's right to appropriate the works of authors would make the public poorer through loss of the benefit of authors' endeavors. This led James Madison to observe, "the utility of [the power conferred by the patent and copyright clause] will scarcely be questioned. . . . The public good fully coincides in both cases with the claims of individuals." The Federalist No. 43, at 186 (J. Madison) (C. Beard ed. 1959). Congress promptly acted on the Constitutional grant of authority, passing the first Copyright Act, modelled on the Statute of Anne, in 1790.

Not long after the creation of statutory copyright, courts developed doctrines that limited the scope of the exclusive rights of authors. Although the copyright acts (pre–1976) ostensibly established absolute rights, the "courts simply refused to read the statute literally in every situation." Sony Corp. of America v. Universal Studios, Inc., 464 U.S. 417, 447 n. 29, 104 S.Ct. 774, 791 n. 29, 78 L.Ed.2d 574 (1984) (referring to the 1909 Act). It was recognized for example that the copyright did not con-

---

7. CCC has entered into bilateral agreements with foreign "Reproduction Rights Organizations" in the United Kingdom (Copyright Licensing Agency Ltd.), Germany (VG Wort), France (Centre Francais du Copyright), Spain (Centro Espanol de Derechos Reprograficos), New Zealand (Copyright Licensing Limited), Norway (KOPINOR), Switzerland (Pro Litteris), Australia (Copyright Agency Limited) and the former U.S.S.R. (Vsesojuznoje Agentstvo Po Avtroskim Pravam). Under these agreements, CCC has the right to grant permission to photocopy users registered under the TRS and licensees under AAS to photocopy, in the United States, copyrighted material for which the Reproduction Rights Organizations have the right to grant such permissions. CCC's surveys of photocopying at corporations in the United States have shown that, on average, approximately twenty-five percent of the photocopying of published copyrighted materials is from foreign publications.

fer upon the author any ownership of the *facts* set forth in the author's writings, or even of the ideas. *See, e.g., Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1879); *Feist Publications, Inc. v. Rural Telephone Service Co.,* ── U.S. ──, ──, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358 (1991); *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 979 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *Sheldon v. Metro–Goldwyn Pictures Corp.,* 81 F.2d 49, 54 (2d Cir.1936) (L. Hand); *Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930) (L. Hand), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931).

Another limitation on authors' absolute ownership has come to be known as the doctrine of "fair use." The need for it was explained by Lord Ellenborough's assertion that "while I shall think myself bound to secure every man in the enjoyment of his copyright, one must not put manacles upon science." *Carey v. Kearsley,* 170 Eng.Rep. 679, 681, 4 Esp. 168, 170 (1803). Thus the doctrine recognized that the advancement of knowledge and learning required some reasonable tolerance within which scholars and authors might freely use or quote from the writings of others for comment, criticism, debate, history, etc., without which the "progress of science" might be retarded rather than advanced by the authors' ownership. In its early days, the doctrine related primarily to abridgements and was known as the rule of "fair abridgement." *See* William F. Patry, *The Fair Use Privilege in Copyright Law* 6–7 (1985) (hereinafter "Patry, *Fair Use*"). The contours of the rule are vague. No judicial opinion

ever undertook to define clear standards for fair use. In the United States' law, the classic opaque statement was articulated in 1841 by Justice Story in *Folsom v. Marsh,* 9 F.Cas. at 342 (C.C.D.Mass.1841) (No. 4,901).[8] Instructing as to how to approach the question of fair use, Story wrote, "In short, we must often ... look to the nature and objects of the selections made, the quantity and value of the materials used and the degree in which the use may prejudice the sale or diminish the profits or supersede the objects of the original work." 9 F.Cas. 342, 348.

▇ The fair use doctrine was not expressly incorporated into statute until the Copyright Act of 1976, which largely adopts the formulation of Justice Story, and purports, according to the legislative commentary, merely to "restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way." House Rep. No. 94–1476, 94th cong., 2d Sess., 66, U.S.Code Cong. & Admin.News 1976, 5659, 5679. *But see* Patry, *Fair Use* at 362. Section 107 of the 1976 Act (which is quoted in full in the margin)[9] instructs that "fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship or research, is not an infringement of copyright." Although the statute does not attempt to define fair use, it instructs that four factors be considered. The four factors, each of which can be found in Justice Story's 1841 summary, are (i) the purpose and character of the use, (ii) the nature of

---

**8.** The appellation "fair use" did not, however, appear until *Lawrence. v. Dana,* 15 F.Cas. 26 (C.C.D.Mass.1869) (No. 8,136). See Alan Latman, Robert Gorman and Jane C. Ginsburg, *Copyright for the Nineties* 579 (1989); Patry, *Fair Use* at 27.

**9.** § 107. Limitations on Exclusive rights: Fair use

Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or

research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

the copyrighted work, (iii) the amount and substantiality of the portion used, and (iv) the effect of the use on the potential market for the copyright. As vague, broad and far reaching as these factors are, the Supreme Court has noted that they are not exclusive and that the fair use doctrine is an " 'equitable rule of reason.' " *Stewart v. Abend*, 495 U.S. 207, 236, 110 S.Ct. 1750, 1768, 109 L.Ed.2d 184 (1990) (quoting *Sony*, 464 U.S. at 448, 104 S.Ct. at 792). Courts and commentators have repeatedly observed that a fair use inquiry is highly fact-specific and does not readily admit of bright line generalizations. *See, e.g., Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985) (" 'no generally applicable definition [of fair use] is possible, and each case raising the question must be decided on its own facts' " (citation omitted); *Wright v. Warner Books, Inc.*, 953 F.2d 731, 740 (2d Cir.1991) ("The fair use test remains a totality inquiry, tailored to the particular facts of each case").

*First Factor—The Purpose and Character of the Secondary Use*

Throughout the development of the fair use doctrine, courts consistently expressed preference for secondary uses that did not merely copy and offer themselves as substitutes for the original copyrighted text, but that used the matter taken from the copyrighted work for some new objective or purpose. In Story's classic *Folsom* formulation, this preference was expressed in the focus on "the objects of the selections made ... and the degree to which the use ... may *supersede* the objects of the original work." 9 Fed.Cas. at 348 (emphasis added). Story added

[N]o one can doubt that a reviewer may fairly cite [quote] largely from the original work, if ... [its design be] ... criticism. On the other hand, it is as clear, that if he thus [quotes] the most important parts of the work, with a view, not

to criticise, but *to supersede the use of the original work,* [infringement will be found]. 9 F.Cas. at 344-45 (emphasis supplied).

An example of this thinking was set forth in 1740 in one of the earliest fair use cases, *Gyles v. Wilcox*, 26 Eng.Rep. 489, 2 Atk. 141 (1740) (No. 130), relating to abridgements, which stated,

Where books are colourably shortened only, they are undoubtedly infringement within the meaning of the [Statute of Anne]....

But this must not be carried so far as to restrain persons from making a real and fair abridgment, for abridgments may with great propriety be called a new book, because ... the invention, learning, and judgment of the [secondary] author is shewn in them....

Rulings and explanations of this sort led courts eventually to generalize that under the first factor "productive" uses were favored. *Sony*, 464 U.S. 417, 478-479, 104 S.Ct. 774, 807 (Blackmun, J., dissenting).[10] (The word "productive" was not necessarily an ideal description of the line of authorities because it risked the misconception that it encompassed any copying for a socially useful purpose. In fact, as illustrated by the quotations above from *Gyles* and *Folsom*, what the early authorities had meant was a secondary use that was productive in that it produced a new purpose or result, different from the original—in other words, a secondary use that transformed, rather than superseded, the original.)

Some courts reached the conclusion that such a productive use was essential to a finding of fair use. For example, in the Court of Appeals decision that was reviewed in *Sony, Universal City Studios v. Sony Corp. of America*, 659 F.2d 963, 970 (9th Cir.1981), *rev'd*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), the Ninth Circuit had excluded the possibility of fair use for non-productive copying of televised

**10.** The leading treatise, moreover, recognizes that "virtually all fair use cases reflect the 'productive use' principle in their facts if not in their stated rationale." 3 Melville B. Nimmer and David Nimmer *Nimmer on Copyright* § 13.-05[A][1] at n. 23.10 (1991) (hereinafter "*Nimmer*"); *see also* Latman, Gorman, Ginsburg, *Copyright for the Nineties* 580 (1989); Leon Seltzer, *Exemptions and Fair Use in Copyright* 24 (1978).

broadcasts using a video recorder. The Supreme Court criticized the Circuit for over-rigidity. On the basis of its "equitable" analysis, the Supreme Court ruled that a non-productive video recording could be fair use if done solely for the purpose of shifting the time at which a private subscriber could see the broadcast, without any commercial motivation and without observable cost or loss to the value of the copyright. Justice Stevens emphasized the clause of the first statutory factor that focuses on whether the use is of a "commercial or ... non profit" character. "If the Betamax [copier] were used to make copies for a commercial or profit-making purpose, such use would be presumptively unfair. The contrary presumption is appropriate here, however, because the District Court's findings plainly establish that time-shifting for private home use must be characterized as a noncommercial nonprofit activity." 464 U.S. at 449, 104 S.Ct. at 792.

The *Sony* holding did not overturn the preexisting concept that productive or transformative uses were favored over non-productive, merely superseding copies. It ruled only that productivity was not determinative in the inquiry, and that equitable considerations could lead to a conclusion of fair use in spite of a non-productive copying.[11] In fact, in its next consideration of fair use, in *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), the Supreme Court reiterated the pertinence of whether the use is productive. *See Nation,* 471 U.S. at 561, 105 S.Ct. at 2231 ("The fact that an article is originally 'news' and therefore a productive use is simply one factor in a fair use analysis.").

What has emerged since the Supreme Court's *Sony* decision seems to be a two-track pattern of interpretation of the first factor: Secondary users have succeeded in winning the first factor by reason of either (1) transformative (or productive) nonsuperseding use of the original, or (2) non-commercial use, generally for a socially beneficial or widely accepted purpose.

Where courts have considered transformative, productive, non-superseding secondary uses of the type that were favored in the historical development of fair use, they have attached little importance to the presence of profit motivation. Courts have recognized that most instructive publishing activity involves profit motivation. Thus text books, newspapers, criticism, historical books, medical and scientific materials, are all published in major part by commercial publishers with a profit motive. Furthermore, authors and scientists, critics and journalists, all must earn their living and frequently receive payment for their writings. The ability to quote from written texts is extremely important for such writing. If the existence of a profit motive were virtually to disqualify writing from entitlement to fair use protection, its benefits would virtually disappear, and the categories of enterprise cited in the introductory language of Section 107—criticism, comment, news reporting, teaching, scholarship and research—would be effectively barred use of quotation unless they were done as philanthropy. Thus courts have repeatedly found in favor of transformative secondary uses on the first factor, notwithstanding the presence of profit motivation. *See, e.g., Consumers Union of United States, Inc. v. General Signal Corp.,* 724 F.2d 1044, 1049 (2d Cir.1983), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984) ("Although the purpose of [the] use undoubtedly is commercial, this fact alone does not defeat a fair use defense ... Almost all newspapers, books and magazines are published by commercial enterprises that seek a profit"); *Rosemont Enters., Inc. v. Random House, Inc.,* 366 F.2d 303, 307 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967) ("Whether an author or publisher reaps economic benefits from the sale of a biographical work, or whether its publication is motivated in part by a desire for commercial gain ... has no bearing on whether a public benefit may be derived

**11.** *Cf.* Patry, *Fair Use* at xi ("[*Sony* should not] be read as a rejection of the productive use concept.").

from such a work. Moreover, the district court in emphasizing the commercial aspects of the Hughes biography failed to recognize that 'all publications presumably are operated for profit' "); *see generally*, 3 *Nimmer* § 13.05[A] at n. 24. Thus, although courts ritualistically proclaim, almost as a mantra, that every commercial use is "presumptively" unfair, that presumption is easily overcome by a transformative, nonsuperseding use. *Cf. Rogers v. Koons*, 960 F.2d 301, 309 (2d Cir.1992) ("whether the profit element of the fair use calculus affects the ultimate determination of whether there is a fair use depends on the totality of the factors considered; it is not itself controlling"); *Maxtone–Graham v. Burtchaell*, 803 F.2d·1253, 1262 (2d Cir. 1986), *cert. denied*, 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987) ("Only an unduly narrow reading of the language of *Sony Corp.* and an inattention to the context could lead to the conclusion that the Court intended to attach heightened significance to the element of commerciality"); *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067 (2d Cir.1992).

■ On the other hand, as the second track, the *Sony* opinion makes clear that at least certain *nonprofit* uses can qualify as fair use, even though they may involve nonproductive superseding copies. The Court of Claims in *Williams & Wilkins v. National Institute of Health*, 203 Ct.Cl. 74, 487 F.2d 1345 (1973), *aff'd by equally divided Court*, 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975), had reached a similar conclusion.

*Williams & Wilkins* involved photocopying carried on by scientists at the National Institute of Health and the National Medical Library. In making its finding of fair use the Court stressed that this copying

was being done by governmental nonprofit organizations devoted exclusively to the advancement of science.[12] 487 F.2d at 1354. The court made clear that the freedom from the "taint" of commercial gain was essential to the finding of fair use. The Court of Claims strongly implied that its conclusion would have been opposite had a motive of commercial gain been present.

I conclude that on either branch of the analysis plaintiffs win the first factor, as Texaco's copying is neither transformative nor noncommercial.

■ *Texaco's copying is not transformative or productive but is superseding.* Texaco's copying is not of the transformative, nonsuperseding type that has historically been favored under the fair use doctrine. Texaco simply makes mechanical photocopies of the entirety of relevant articles. Nor is the copy of the original employed as part of a larger whole, for some new purpose. The dimensions of the original and of the copy are identical. The principal purpose of Texaco's copies is to supersede the original and permit duplication, indeed, multiplication. A scientist can make a copy, to be read subsequently and kept for future reference, without preventing the circulation of the journal among coworkers. This kind of copying contributes nothing new or different to the original copyrighted work. It multiplies the number of copies. This is the type of superseding copying that has been disfavored since the earliest discussions of the doctrine and was thought by many to preclude a finding of fair use prior to the Supreme Court's decision in *Sony*.

Texaco argues that this copying should be considered "productive" because its purpose is to advance scientific discovery.[13]

**12.** "NIH and NML are non-profit institutions devoted solely to the advancement and dissemination of medical knowledge ... and are not attempting to profit or gain financially by the photocopying ... scientific progress, untainted by any commercial gain from the reproduction is the hallmark of the whole enterprise of duplication." 487 F.2d at 1354.

**13.** Texaco points out that "research" is one of the categories listed in the introductory portion

of the statute as illustrative of activities in which fair use can be found ("such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research...." 17 U.S.C. § 107), and that there are Second Circuit opinions that ostensibly make these categories presumptively determinative of the first factor.

I do not believe the Circuit intended by those assertions to nullify or disregard the historical focus of fair use adjudication on whether the

The argument fails for several reasons. That is not the kind of productivity that was intended by the discussions and holdings. As noted above, what was meant was that the copying should produce something new and different from the original, and not that a superseding copy would qualify, so long as it was made in pursuit of a beneficial cause. If the latter were the meaning of the doctrine, precious little would be left of the copyright protection as applied to scholarly or scientific writing. For scholarly and scientific writing has no readership except among those who use it in scholarly and productive or educational undertakings. If that fact alone were sufficient to justify the making of superseding copies, the authors and publishers of scholarly, scientific and educational materials could not protect their copyrights and could not survive as against inexpensive copier technology. *See Weissmann v. Freeman,* 868 F.2d 1313, 1325 (2d Cir.), *cert. denied,* 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989) ("Encouraging authors to use their talents by holding out a promise of reward for their efforts is the surest way to advance the public welfare.... Hence, while recognizing that fair use finds greater application in a factual scientific context, that recognition should not blind a court to the need to uphold those incentives necessary to creation of" scientific papers).

Texaco argues also that its copies should be considered transformative because it is important for scientists like Chickering to work with a photocopy and *not* with the original. It argues that the original is in many ways not useful to a scientist. Chickering testified that he needs a photocopy, in preference to an original, because he wishes to write notes in the margin and to take it into the lab where it may be exposed to corrosive chemicals, without damaging the original. He also needs a photocopy because it is less bulky; its slender 8–10 pages can be conveniently taken home to read or stored in a file, in preference to a 200–page complete issue, much less a complete annual volume.

This argument has some merit. In some circumstances, photocopying for the purpose of transferring text onto material of different character or shape could be a convincing transformation. Thus if the original were copied onto plastic paper so that it could be used in a wet environment, onto metal so that it would resist extreme heat, onto durable archival paper to prevent deterioration, or onto microfilm to conserve space, this might be a persuasive transformative use. Indeed, if Chickering were the subscriber and sole user of the subscription to *Catalysis,* and he made an extra copy of an article for use in the lab or for marking with scratch notes, the argument might have considerable force.

Here, however, where three subscriptions to *Catalysis* are serving the needs of hundreds of scientists, the principal feature of the photocopying is its capacity to give numerous Texaco scientists their own copy based on Texaco's purchase of an original. The most prominent feature of this copying is that the copies supersede the original

particular use is superseding or productive. For such a ruling would contradict the Supreme Court's instruction in *Nation* that "the examples enumerated in § 107 [are] to 'give some idea of the sort of activities the courts might regard as fair use under the circumstances'.... This listing *was not intended to be exhaustive ... or to single out any particular use as presumptively a 'fair' use.''* 471 U.S. at 561, 105 S.Ct. at 2231 (emphasis added). *See also* Patry, *Fair Use* at 363. It would also fly in the face of the legislative assertion of intent to merely "restate [the doctrine] ... not to change, narrow or enlarge it in any way." Finally, it is incompatible with the oft-stated assertion under the first factor that commercial uses are presumptively unfair.

So, for example, in *Weissmann* the Circuit gave no weight to the fact that the secondary use was for "teaching," "scholarship," and "research," and awarded the first factor to the copyright owner because the secondary use was superseding, nonproductive and motivated by professional advancement. *See Weissmann* at 868 F.2d at 1324.

Nonetheless, even if the Second Circuit has adopted a categorical test for the first factor, this *does not change the result of the overall* inquiry in this case. If Texaco's profit-motivated superseding photocopying wins the first factor merely because it is done for research, the decisive award to the plaintiff of the third and fourth factors and the equitable considerations, *see* discussion *infra,* in any event requires a finding for the plaintiffs on the overall question of fair use.

and multiply its presence. Thus even if some transformative purpose was present in transferring the article from its journal into a slender photocopy, that use is overshadowed by the primary aspect of the copying, which is to multiply copies.

■ Finally, Texaco argues its use of copies should be considered favorably under the first factor because the principal purpose of the copying is to state reported facts accurately. A number of courts and commentators have noted that quotation can be a favored secondary use (of the transformative type) when quotation is necessary to convey factual material (or ideas) accurately, or to demonstrate the validity of assertions of fact. *See, e.g., New Era Publications Int'l, ApS v. Henry Holt and Co.* (*"New Era"*), 873 F.2d 576, 592 (2d Cir.1989), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990) (Oakes, C.J, concurring) ("words that are facts calling for comment are distinguishable from words that simply enliven text. The law recognizes that words themselves may be facts to be proven"); *New Era,* 884 F.2d 659, 663 (Newman, J., dissenting from denial of rehearing en banc) ("expressive words sometimes need to be copied 'in the interest of accuracy, not piracy'") (quoting *Consumers Union,* 724 F.2d at 1049); Arthur Schlesinger Jr., *The Judges of History Rule,* Wall St.J., October 26, 1989, at Sec. 1, page 16, Col. 3 ("when responsible scholars gain legitimate access to unpublished materials, copyright should not be permitted to deny them use of quotations that help to establish historical points"); Jon O. Newman, *Not the End of History: The Second Circuit Struggles With Fair Use,* 37 J. Copyright Soc'y 12, 15 (1990) ("[C]opying of otherwise protected expression may be justified by the need to report facts fairly and accurately"); Leval, *Toward a Fair Use Standard,* 103 Harv. L.Rev. 1105, 1114 (1989) (hereinafter "Leval, *Toward a Fair Use Standard"*) ("[H]istory, biography, and journalism benefit from accurate quotation of source documents, in preference to a rewriting of the facts, always subject to the risk that the historian alters the 'facts' in rewriting them.").

Texaco argues that photocopying by its scientists should come within this principle. It contends that its scientists have little or no interest in copying the expressive portions of the originals, that what they need are primarily the formulas, graphs and tables that set forth the results of studies and experiments. Note taking would not only consume inordinate time, but carry a high risk of costly error.

Although the argument has some merit, it does not prevail on these facts. First, Chickering and his colleagues do not copy only the formulas, graphs and tables. The eight-item sample (as well as the other photocopies) taken from Chickering's files (and others) shows that the practice is to copy the entire article. Furthermore, his deposition showed that he often made the copies *before* reading the original. Neither the practice nor the purpose were limited to the accurate preservation of the facts contained in formulas, graphs and tables. The major purpose of such photocopying has been multiplication of copies. This permits the scientist to defer reading, and to keep possession of an additional copy without hoarding the original issue of the journal, so that the original can circulate without delay among colleagues (each of whom may do likewise), or return to the library where all colleagues will have access to it. Texaco's argument, although ingenious, simply does not fit the facts of the case.

■ *Texaco's copying is for commercial gain.* Nor does this come within the class of copying that has prevailed under the first factor because of its nonprofit educational or social value.

Texaco contends its copying should be considered comparable to that in *Williams & Wilkins*—copying done by scientists for the purpose of advancing science, rather than for commercial gain. Texaco emphasizes the social good to be derived from its research, including the development of cleaner burning, more efficient fuels to benefit the earth's ecology and resources. Texaco points out that its scientists and engineers are encouraged by Texaco to participate in scientific meetings and symposia

and to publish papers of scientific merit. From 1986 to 1991 Texaco scientists have published more than 130 papers. In addition, Texaco scientists work with members of the academic community to exchange results of research. And Texaco finances research at universities in areas of common interest. Texaco contends it shares the results of its research with the scientific community at large by encouraging its scientists to write and publish articles and make presentations at scientific symposia.

Notwithstanding all this, I cannot accept Texaco's argument. Granted, the copiers are scientists, they are using their copies to assist in socially valuable scientific research, and they do not resell the copies. Nonetheless their research is being conducted for commercial gain. Its purpose is to create new products and processes for Texaco that will improve its competitiveness and profitability. Chickering testified that he selected articles to copy because they related to the research that he was doing in the course of his employment at Texaco. The purpose of this research was in each case to improve Texaco's commercial performance.

In sum, because the secondary use in question was copying of a superseding nature (done to create additional copies of the original) and was not transformative (or productive in the fair use sense), and because it was carried on in a commercial context for the purpose of producing profits, I find that plaintiffs easily prevail on the first factor inquiring into the purpose and character of the use.

*Second Factor—The Nature of the Copyrighted Work*

■ The second factor under § 107 looks to the "nature of the copyrighted work." Although there is an aspect of the facts that favor plaintiffs, I conclude that this factor favors Texaco.

The aspect that favors the plaintiffs is that the articles and materials published in *Catalysis* are created for publication with the purpose and intention of benefitting from the protection of the copyright law. These are the kinds of exercises of authorship that the copyright law was designed to protect in its objective "to promote the progress of science." In contrast, there are other types of writings that enjoy copyright protection although they are made for purposes incompatible with the public-benefit objective of the copyright law, such as functional communications intended to be kept secret. Examples might be an extortion note, or a bank robber's written instructions to confederates with diagrams assigning tasks for carrying out the robbery. Such writings, in no way partake of the purpose to promote the advance of knowledge; they may enjoy a lower claim to protection from fair use than writing created for public dissemination with the intent to benefit from the protections of the copyright.

Copyright protection is vitally necessary to the dissemination of scientific articles of the sort that are at issue. This is not because the authors insist on being compensated. To the contrary, such articles are written and published without direct payment to the authors. But copyright protection is essential to finance the publications that distribute them. Circulation of such material is small, so that subscriptions must be sold at very high prices. If cheap photoduplications could be freely made and sold at a fraction of the subscription price, *Catalysis* would not sell many subscriptions; it could not sustain itself, and articles of this sort would simply not be published. And without publishers prepared to take the financial risk of publishing and disseminating such articles, there would be no reason for authors to write them; even if they did, the articles would fail to achieve distribution that promoted the progress of science. Being the type of authorship that the copyright laws were designed to protect, this type of publication has a stronger claim to protection from copying than secretive private functional communications. *See* discussion in Leval, *Toward a Fair Use Standard*, at 1116–1122.

On the other hand, courts have often observed that "the scope of fair use is greater with respect to factual than nonfactual works." *New Era Publications Int'l*

*ApS v. Carol Publishing Group*, 904 F.2d 152, 157 (2d Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990); *Rogers*, 960 F.2d at 310; *see generally* Gorman, *Fact or Fancy? The Implications for Copyright*, 29 J. Copyright Soc'y 560 (1982). It is difficult to tell whether such a judicial assertion about fair use is intended as prescriptive or descriptive. This may be nothing more than the logical consequence of two other principles: First, that facts are not subject to copyright ownership, *Feist Publications*, 111 S.Ct. at 1287; *Hoehling*, 618 F.2d 972, and second, the principle, discussed above, that quotation when done for the purpose of reporting facts accurately has a high claim for recognition as a favored purpose under the first fair use factor. *See* authorities cited on pages 14–15 above. Regardless whether the statement is a prescriptive utterance of a rule creating for factual material a special vulnerability to fair use, or merely a description of the inevitable consequence of the application of other rules about factual writing, it is unquestionably true that fair use is more easily found where the copyrighted material is of a factual nature rather than a fictional type. The material here being copied by Texaco's scientists is "essentially factual in nature," *Maxtone-Graham*, 803 F.2d at 1263, consisting of reports on scientific experimental research. The texts describe procedures followed and characterize the results found. Results are expressed largely in tables and graphs. I therefore conclude that the second factor favors Texaco.

*Third Factor—Amount and Substantiality of Portion Used*

■ The third factor looks to "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." This factor clearly favors the plaintiffs, as Chickering has copied the entirety of the copyrighted articles in question. The Supreme Court acknowledged in *Sony* that the reproduction of an entire copyrighted work ordinarily "militat[es]

against a finding of fair use." [14] *Sony*, 464 U.S. at 450, 104 S.Ct. at 792; *see also* Patry, *Fair Use* 449–450 ("Prior to ... *Williams & Wilkins Co. v. United States*, the courts had uniformly denied fair use for the copying of entire works.... This has continued to be generally true after *Williams & Wilkins* and the passage of the 1976 Act, with the notable exception of ... Sony"); 3 *Nimmer* § 13.05[A][3] ("generally it may not constitute a fair use if the entire work is reproduced").

Texaco argues that its scientists should be found to have copied only a small fraction of the copyrighted work when they photocopy an entire article. Texaco points out that Academic Press registers entire issues of the *Journal of Catalysis* with the Copyright Office and does not register separately the individual articles. As an average issue of *Catalysis* is around 200 pages long while an average article is 8 to 10 pages long, Texaco argues that the photocopying of an article copies approximately 4% of the copyrighted work.

This argument constitutes imaginative lawyering, but it does not prevail. Each article, note or letter published in *Catalysis* is a separately authored work, protected by a copyright, which the authors have assigned to Academic Press. Because it would involve gigantic expense and inconvenience to register separately each of the 20 odd items that appear in an individual issue, Academic Press registers each issue with the Copyright Office. It does not follow from the manner of registration with the Copyright Office that the "copyrighted work" for the purposes of fair use analysis consists of the entire issue rather than the separate creations of the separate authors. Plaintiffs win the third factor.

*Fourth Factor—Effect on the Market for the Copyrighted Work*

■ The fourth factor looks at "the effect of the use upon the potential market for or value of the copyrighted work."

---

**14.** The Supreme Court found in *Sony* that this ordinary effect was counteracted because the copying "merely enables a [private non-commercial] viewer to see [at a more convenient time] a work that he has been invited to witness *in its entirety* free of charge." 464 U.S. at 448, 104 S.Ct. at 792 (emphasis added).

18

Plaintiffs contend that were it not for the photocopying practiced by Texaco's scientists, Texaco would need to provide its scientists additional copies through any one or more of a number of different routes, all of which would substantially supplement the revenues of the copyright owning publishers:[15] Plaintiffs argue Texaco could purchase additional subscriptions; it could purchase back issues or back volumes; it could order tear sheets from document delivery services that purchase subscriptions; it could order photocopies from document services that make copies under license agreements with the plaintiff-publishers and pay royalties to the publishers for all copies made; it could negotiate a license directly with a particular publisher to pay a blanket fee for the right to make photocopies at will; or, alternatively, Texaco could photocopy articles as needed for its scientists by operating under the TRS or AAS license services offered by the CCC.

I find that plaintiffs have powerfully demonstrated entitlement to prevail as to the fourth factor.

Texaco does not seriously contest that its scientists need photocopies of pertinent scientific journal articles to use in conducting their research. Indeed, Texaco argues the need is so great that it should dictate a finding of fair use. (This argument is discussed below in the section on equitable factors.) It is clear that, if the making of unauthorized photocopies is found not to be a fair use, Texaco will nonetheless continue to provide its scientists with copies, so long as there exists a means of doing so that is not excessively expensive or burdensome. The publishers have persuasively shown

that there exist convenient and reasonably priced procedures by which Texaco could obtain the necessary additional copies for its scientists. If court rulings established that the existing practice of making photocopies violates plaintiffs' copyright, Texaco would resort to one or more of these procedures to provide its scientists with copies that are necessary for their research, and Texaco's doing so would add significantly to the plaintiffs' revenues and the value of its copyrights.

Texaco seeks unsuccessfully to show that Academic Press would not receive substantial additional revenues if Texaco (and similarly situated photocopiers) ceased to make unauthorized photocopies. While Texaco makes valid points on certain issues, its contentions do not undermine the strength of the publishers' proof of loss of revenue. First, in response to the publishers' contention that Texaco would buy additional subscriptions, back issues or back volumes, Texaco argues that what a scientist needs is a *photocopy*, and that need would not be served by additional subscriptions, back issues or back volumes. A scientist wants a *photocopy* on which to scribble notes in the margin without defacing an original; the photocopy also will be taken into the laboratory where corrosive chemicals may spill on it without fear of damaging the original. Furthermore, complete issues (or, *a fortiori*, complete volumes) are far too bulky to be kept in scientist's files or even used conveniently. All of this makes complete issues of the journal impracticable. Texaco shows, furthermore, that Academic Press does not offer reprints on terms convenient to the needs of

15. In appraising the effect of Texaco's photocopying on the values of the publishers' copyrights, Chickering's eight copies are considered as representative, and not as the universe of alleged infringement. *See* 3 *Nimmer* § 13.05[A] ("It is submitted ... that it is a mistake to view this factor ... as merely raising the question of the extent of damages to plaintiff caused by the particular activities of the defendant. This factor rather poses the issue of whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market for or value of the plaintiff's present work."). Chickering is one of 400–500 scientists employed by Texaco in research. His files contained numerous copies of items from *Catalysis*, as well as from other publications. This does not include additional copies Chickering may have made from time to time and later discarded. Texaco's own evidence is to the effect that such photocopying is "customary" among scientists employed in research. The evidence submitted, including the annual license fees established by CCC for similar large petroleum companies, supports the inference of voluminous photocopying in the aggregate by Texaco's scientists, that would justify very substantial license fees if such copying is not fair use.

Texaco's individual scientists as reprints may be purchased only with a minimum order of 100 copies. Thus, Texaco argues, if Texaco stopped making photocopies for Chickering and his colleagues, Texaco would not replace those photocopies by purchasing numerous additional subscriptions or by purchasing back issues and back volumes. Such purchases would not serve the necessary ends. I find that Texaco's contentions are substantially correct (although perhaps slightly overstated). I accept as correct that Texaco would not ordinarily fill the need now being supplied by photocopies through the purchase of back issues or back volumes. I accept also that Texaco would not fill this need by enormously enlarging the number of its subscriptions. Nonetheless, this does not significantly undermine the plaintiffs' position.

The plaintiffs have shown that there are a variety of other avenues Texaco could and would follow to provide its scientists promptly and relatively inexpensively with working copies of articles for their files (which would produce revenues for the publishers). These include the ordering of photocopies from document delivery services that would pay royalties to the publishers, the negotiation of blanket licenses with individual publishers, and the use of a CCC license under either the TRS or the AAS.

Moreover, although I accept Texaco's contention that it would not replace its scientists' individual copies by vastly increasing the number of subscriptions, the evidence supports the inference that, if Texaco stopped photocopying, it would increase the number of subscriptions somewhat. It is important that scientific and technical journals be promptly circulated so that research scientists are made promptly aware of new published studies in the areas of their work. Previously, Texaco has increased the number of its subscriptions to *Catalysis* (from one to two and later to three) in order to speed up the circulation process. The evidence shows that scientists will make a photocopy of an article in

order not to slow down the circulation process. If that photocopying stopped, the circulation would slow down; scientists would hold onto an issue for a longer time before continuing its routing. To speed up the circulation, it seems likely that Texaco would add at least a modest number of subscriptions to *Catalysis* which would increase Academic Press' revenues. Nor does Texaco's evidence contradict the probability that, if it stopped photocopying, its scientists would place orders for photocopies with document delivery services; such document services would promptly make and deliver photocopies, bill Texaco a modest fee, and pay royalties to the publisher under a private license agreement.

Finally, as noted above, the publishers have shown that the copying licenses offered by CCC would also satisfy the needs of Texaco's scientists for photocopies at a reasonable cost and burden to Texaco. This would provide significant additional revenue to the publishers and add value to their copyrights.

The court finds that if Texaco stopped making "free" photocopies, it would fill this gap through some combination of the methods discussed and, in doing so, would add significant value to the publishers' copyrights. It is impossible to predict which of the possible procedures Texaco would employ to achieve speed and efficiency, to avoid administrative burden and to control expense. But it is clear that whatever combination of procedures Texaco used, the publishers' revenues would grow significantly.

Texaco also argues that Academic Press' growing subscription revenues and glowing profitability disprove that it is being harmed by Texaco's photocopying practices.[16] (The Court of Claims reached a similar conclusion in *Williams & Wilkins*. The Court of Claims noted the enormously successful subscription and revenue figures enjoyed by the plaintiff-publisher and concluded that such impressive commercial

---

**16.** Texaco has introduced evidence that Academic Press is considered the "crown jewel" of

Harcourt Brace Jovanovich Inc.

**20**

success disproved plaintiff's contention that it was being hurt financially by the photocopying practices at NIH. *See Williams & Wilkins*, 487 F.2d at 1357.)

■ The argument has no merit. Furthermore, it distorts the statutory standard. In order to prevail on the fourth factor, the copyright owner is not required to demonstrate that it has been reduced to poverty by the defendant's copying.[17] Rather, "to negate fair use one need only show that if the challenged use 'should become widespread, it would adversely affect the *potential* market for the copyrighted work.'" *Nation*, 471 U.S. at 458, 105 S.Ct. at 2230–31 (quoting *Sony*, 464 U.S. at 451, 104 S.Ct. at 793) (emphasis added). The fact that the copyright owner is realizing rich profits from the exploitation of its copyrights despite the unauthorized copying has no logical tendency to prove that the secondary user's copying is not diminishing those profits. If the copyright owner would be receiving significantly higher revenue but for the defendant's uncompensated copying, the standard is satisfied, regardless of revenues already being received.

The lack of merit in defendant's argument is easily apparent if we take as a hypothetical case the distribution of recordings of a popular musical group. Precisely when such a recording is selling like hot cakes, the copyright owner at the same time will be realizing high profits and will be most vulnerable to losing profits as the result of unauthorized distribution of bootleg copies. Of course I recognize that Texaco seeks to apply the argument to a far more benign form of infringement than bootlegging of counterfeit recordings, and one that involves no resale. But Texaco's argument does not depend on the type of activity of the secondary user and its relationship to the marketing by the copyright owner. It depends solely on the high profits earned by the copyright owner. The argument has no logical force. Whether there is injury or not must be shown on a

more complete examination of the relevant facts. The fact that Academic Press is enjoying prosperity in no way suggests that the value of its copyrights are not diminished by Texaco's copying practices.

■ Finally, Texaco argues that courts should not attach undue importance to the fourth factor of loss of copyright revenue. In *Nation* the Supreme Court designated this as "the single most important element of fair use." 471 U.S. at 566, 105 S.Ct. at 2233. Texaco's argument asserts: Certain secondary uses are indisputably fair uses because of considerations arising under the first three factors, as well as the public need that they supply. In some cases such secondary uses are so responsive to a public need that many copies will be distributed. If such secondary uses are not fair use, the large number of copies would entitle the copyright owner to substantial royalties. If the loss of copyright revenue is deemed the most important factor, then those deserving secondary uses that respond to an important public need will never qualify as a fair use if they generate large sales.

Texaco is quite right in my view that to give dominant significance to loss of revenue under the fourth factor can result in denying protection to secondary uses that richly deserve it on the basis of other factors (primarily the first). Suppose, for example, a nonprofit foundation for the study of history produces a new history of the cold war, including fascinating insights into the motivations of Kruschev, substantiated by a few brief quotations from speeches and writings previously unknown in this country. Assume that examination of the first three factors would powerfully indicate a fair use, but the enormous sales of the new book would generate a substantial royalty if the quotations are not fair use. Will the loss of potential royalty income convert a fair use into an infringement—subject even to injunction—because of the asserted predominance of the fourth factor? The same question can be put as to a

---

17. Indeed, the Supreme Court has stated that for the copyrightholder to prevail on this factor, "[a]ctual present harm need not be shown; such

a requirement would leave the copyrightholder with no defense against predictable damage." *Sony*, 464 U.S. at 451, 104 S.Ct. at 793.

parody. If the fourth factor is by far the most important, this may mean a parody that flops is a fair use, but a commercially successful parody infringes.

There is considerable force in Texaco's argument that this should not be the law. The importance of the fourth factor should depend on the analysis produced by examination of all the factors. If the other factors clearly indicate that the secondary use should be considered fair use, then the copyright owner's deprivation of royalty revenue might play very little role in the analysis.[18]

In short, Texaco argues that all four factors should play a role; that fair use inquiry is highly fact-specific, and that the degree to which one or another factor dominates in a particular analysis will change from instance to instance. I believe that Texaco's arguments express a correct understanding of the law of fair use. I do not think the Supreme Court would disagree with Texaco's argument. The statement in the *Nation* that the fourth factor "the single most important element," 471 U.S. at 566, 105 S.Ct. at 2233, assumes a greater importance when quoted in isolation that it projected in the context of the *Nation* opinion as a whole. For, in going through the factors one by one, the Supreme Court ascribed importance to each of them. For example, as to the first factor, the Court stated that "every commercial use of copyrighted material is presumptively an unfair exploitation of [copyright]." 471 U.S. at 562, 105 S.Ct. at 2231. As to the second, the Court "conclude[d] that the unpublished nature of a work is '[a] key, though not necessarily determinative, factor' tending to negate a defense of fair use." 471 U.S. at 554, 105 S.Ct. at 2227. As to the third, the Court stressed the great importance of the fact that the defendant had taken "the heart" of the plaintiff's book. 471 U.S. at 565, 105 S.Ct. at 2233. In the end it seems the Court was saying that, depending on the particular facts, each of the factors can have significant importance. Notwithstanding the oft-quoted assertion of the paramount importance of the fourth factor, I agree with Texaco that in an appropriate case the Supreme Court would give proper importance to the other statutory factors and would not allow the mere loss of hypothetical royalty revenue to convert a fair use into an infringement.

Nonetheless this argument does not help Texaco in this case. This is not a case where hypothetical loss of revenue arguably converts fair use to infringement. Here, without reaching the fourth factor, analysis of the other considerations strongly favors the plaintiffs' contention that Texaco's copying infringes the publishers' copyrights. The fourth factor merely confirms that conclusion. Thus, even if the Supreme Court would agree that the fourth factor is not always the most important, that would not help Texaco here.

In view of the fact that the publishers have demonstrated a substantial harm to the value of their copyrights through such copying, the fourth factor gives strong support to the conclusion that this copying is not a fair use.

### Equitable Rule of Reason

▆ The Supreme Court in *Sony* characterized the fair use doctrine as an "equitable rule of reason." *Sony,* 464 U.S. at 448 & n. 31, 104 S.Ct. at 792 & n. 31 (quoting H.Rep. No. 94–1476, at 66–66, U.S.Code Cong. & Admin.News 1976 at 5680),[19] and explained in *Stewart* that the fair use doctrine " 'permits courts to avoid

---

**18.** *Cf.* Leval, *Toward A Fair Use Standard* 1124–1125: "By definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties. Therefore, if an insubstantial loss of revenue turned the fourth factor in favor of the copyright holder, this factor would never weigh in favor of the secondary user. And if we then gave serious deference to the proposition that it is 'undoubtedly the single most important element of fair use,' fair use would become defunct." *See also* William W. Fisher III, *Reconstructing the Fair Use Doctrine,* 101 Harv.L.Rev. 1659, 1671–1672 ("fairly applied, the version of the market-impact factor adopted in *Harper & Row* will almost always tilt in favor of the plaintiff—and is therefore nearly useless in differentiating between fair and unfair uses of copyrighted material").

**19.** But *see* Patry, *Fair Use* at 4.

rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.' " *Stewart*, 495 U.S. at 236, 110 S.Ct. at 1768 (quoting *Iowa State University Research Foundation, Inc. v. American Broadcasting Cos.*, 621 F.2d 57, 60 (2d Cir.1980)); *see generally*, Lloyd L. Weinreb, *Fair's Fair: A Comment on the Fair Use Doctrine*, 103 Harv.L.Rev. 1137 (1990). The statute, furthermore, does not characterize the four listed factors as exclusive. Thus, although I find that analysis under the four enumerated factors strongly favors the plaintiffs, I go on to consider a number of equitable arguments proffered by Texaco that do not fit neatly into the four-factor analysis.

Texaco contends its photocopying should come within the principles of *Sony* and *Williams & Wilkins* and should be found a fair use. I conclude that the *Sony* and *Williams & Wilkins* decisions do not cover Texaco's activities and do not give comfort to Texaco's claim to fair use.

It should be noted, in the first place, that *Sony* and *Williams & Wilkins* do not purport to define the heartland of fair use. To the contrary, they present themselves as defining its remote extremities. Each decision recognizes the presence of facts that argue strongly *against* a finding of fair use but concludes by reason of other particulars (that are not present in this case) that a finding of fair use is justified.

In *Sony*, the Court recognized that the copying was nonproductive and took the *entirety* of the copyrighted work; the Court acknowledged that these facts argued against a finding of fair use. The conclusion of fair use was found to be justified by the fact that the copying activity (i) was private, (ii) was noncommercial, (iii) was done to permit the consumer one viewing at a convenient hour of copyrighted material that was offered to him free of charge, and (iv) caused no appreciable loss of revenue to the copyright owner. None of those factors is present in this case. This copying is neither private nor noncommercial. Although Texaco attempts to characterize the copying as done for the "personal" use of its scientists, the copying is in fact being done to assist Texaco in its pursuit of scientific research that is done to bring it competitive commercial advantage. The Supreme Court's finding in *Sony* that the making of time-shifting copies caused no economic loss to the copyright owners has no application here. Here the free photocopying practiced by large numbers of scientists employed by a large research-oriented company deprives the publishers of substantial revenues.

Texaco argues that having purchased subscriptions to *Catalysis*, it has then been invited by the publisher to have each of its scientists read *Catalysis* free of any additional charge and is therefore in a position comparable to the *Sony* home timeshifter when it permits its scientists to make photocopies to facilitate such reading. The argument has some force. Texaco's equitable position is certainly better than it would be if its scientists made photocopies from public library copies without Texaco having purchased any subscriptions.

Nonetheless, the circumstances are very different from *Sony*. Texaco uses three subscriptions to *Catalysis* to furnish copies to hundreds of scientists. That is a far cry from the single user's one-time viewing hypothesized in *Sony*.

As to *Williams & Wilkins*, it too is easily distinguishable from the present facts. Taking its own holding at face value, it strongly suggests that Texaco's use should be considered infringing.[20]

---

**20.** A ruling of the Court of Claims, furthermore, is not binding in this Circuit. *Williams & Wilkins* has been severely criticized by copyright scholars. *See, e.g.*, 3 *Nimmer* § 13.05[E][4][c] ("This landmark decision by the Court of Claims appears to this writer to be seriously in error, with implications that might well justify its description by one of the dissenting judges as 'the Dred Scott decision of copyright law' "); Patry,

*Fair Use* at 180 ("The short explanation for the decision of the Court of Claims majority is that it knew the result it wanted but unfortunately found the law and facts against it. The solution to this problem was threefold: (a) to answer the wrong question; (b) to alter the commissioner's findings of fact without expressly upsetting them so as to make the facts more compatible with the desired result; and (c) to create an

The first argument considered by the *Williams & Wilkins* court as favoring a finding of fair use was that the 1909 Copyright Act left it unclear whether photocopying was among the exclusive rights of the copyright owner. 487 F.2d at 1350–1352, 1359. If the Court of Claims was correct in that observation, it is certainly no longer available, as the 1976 Act clearly specifies in § 106(1) that "the owner of the copyright has the exclusive rights ... (i) to reproduce the copyrighted work in copies...."

The Court of Claims went on (in Part III of the opinion) to specify numerous factors that supported its conclusion that the photocopying by NIH and NML constituted a fair use. 487 F.2d at 1354, *et seq.* Most of these factors are not available to Texaco. The list included (i) that the plaintiff-publishers were not being economically harmed by the defendant's photocopying practices; (ii) that medicine and medical research would be "seriously hurt" by holding the practices of NIH and NML to be an infringement; (iii) that if infringement were found, the court could not devise a remedy (in the nature of a compulsory license) that would protect defendants' ability to make copies without exceeding judicial authority and trespassing into areas reserved to a legislature; (iv) that the defendants were "non-profit institutions, devoted solely to the advancement and dissemination of medical knowledge," and were not attempting to profit or gain financially by the photocopying; (v) that the researchers for whom the photocopies were made needed them for scientific work and had no purpose to reduplicate them for sale or other distribution; and (vi) "scientific progress, untainted by any commercial gain from the reproduction is the hallmark of the whole enterprise of duplication." The court stated that its conclusion of fair use "rests upon all of the elements discussed in Part III *supra* and not upon any one, or on any combination less than all." 487 F.2d at 1362.

Only one of those factors is present in this case—that being the use of the copies for scientific research without resale. All the rest are notably absent. The absence of most of them from the present facts is so apparent it requires little discussion. For example, that court found no harm to the copyright owners; this court finds that the copyright owners suffer a substantial loss of revenue. Also, while the duplication in *Williams & Wilkins* was devoted solely to scientific progress, untainted by any commercial gain, here it is commercial profit that is the hallmark of the enterprise.

Some of the differences call for comment. Those are the Court of Claims' conclusion that medicine and medical research would be "seriously hurt" if NIH and NML were forbidden from engaging in the copying practice, *see* 487 F.2d at 1356; and that a solution to the problem was beyond the court's power. *See* 487 F.2d at 1359–1360. Since the time of that decision, circumstances have substantially changed; such findings are no longer justified.

A problem that has bedeviled the application of the copyright laws to the making of copies has been the transaction costs of arriving at a license agreement, when a small number of photocopies is made. An honest user, who would be happy to pay a reasonable royalty, faces the problem of the enormous administrative difficulty and expense of making an agreement with the copyright owner for a license to make a single copy. Notwithstanding that the transaction might ultimately involve a fee of no more than a few dollars, enormous time, expense and burden may be involved for both sides in reaching such an agreement. The would-be copier would need to write to the copyright owner (assuming the name and current address can be readily found in the publication), propose a license and ask what the fee would be. The copyright owner would need to set a fee for the proposed transaction (if it did not have standardized rates) and to write back to the copier, who might then accept the proposed

unsupported body of customary law while mischaracterizing or ignoring the holdings of actual precedent").

royalty fee (or make a counter offer). Eventually, through an exchange of correspondence involving a minimum of three letters, agreement could be reached, the copier would send a check for a few dollars to cover the royalty, and proceed to make a copy. A two-dollar royalty might easily engender hundreds of dollars of transaction costs, consuming many wasted hours. It might also delay the making of the copy for weeks.

Because of the outlandishly wasteful delay, expense, and inconvenience involved in negotiating such a transaction, virtually no user has been willing to do it.[21] It therefore became a widespread practice that universities, foundations, research institutes and business companies simply photocopied without authorization. In *Williams & Wilkins* the court noted that during 1970 NIH's library made about 93,000 photocopies, aggregating nearly 1,000,000 pages. Since that time the volume of publications and the practice of photocopying have so proliferated, it is likely that today's numbers are vastly higher. It is clear that scientists at the NIH could not reasonably have entered into negotiations with medical publishers every time their work called for the making of a photocopy of a journal article. The *Williams & Wilkins* court therefore had considerable basis for concluding that medical research would have been substantially harmed by a ruling forbidding such unauthorized copying. Researchers might have been forced to do without photocopies, which would have

been a substantial impediment to their research, or would have needed to engage in absurdly inefficient negotiations. The Court of Claims contemplated that the problem might conceivably be solved by the establishment of compulsory license fees, but concluded that this was beyond the court's power.

The monumental change since the decision of *Williams & Wilkins* in 1973 has been the cooperation of users and publishers to create workable solutions to the problem. *See generally Collectives That Collect* at 45–53. Most notable has been the creation of the CCC, and its establishment of efficient licensing systems—the TRS, established in 1978, followed by the AAS, established in 1983. Because some large users found that the TRS imposed administrative and recordkeeping burdens more onerous than they were eager to assume, the TRS was less successful than had been hoped. In response to the request of users for a system that would free them from TRS' recordkeeping burdens, the CCC developed the Annual Authorization Service. Upon the payment of a single global fee based on an audit of the user's photocopying practice, AAS permits free copying without any administrative burden of recordkeeping or reporting. As noted above, many of the largest corporations involved in research have become licensees under a CCC Annual Authorization.[22]

In addition to the framework created by the CCC, publishers and individual users have also, since *Williams & Wilkins*, de-

---

**21.** Moreover, because hypothetical royalty payments at issue are so small for each copy, it was not practicable for copyright owners to seek to enforce their rights. *See Collectives That Collect* at 2–3.

**22.** Two other CCC licensing programs are illustrative of the ways in which mechanisms have evolved in the age of photocopying to protect the copyrights of authors and publishers without imposing impracticable burdens on photocopy users. First, the CCC has established the Academic Pilot Licensing Program with several universities to develop a blanket licensing program modeled on the AAS for university photocopying. It is expected that the blanket license will cover individual and collective research or administrative reprography, but not "course packets," which are expected to continue to be

licensed on a transactional basis. *See* Ginsburg, *Reproduction of Protected Works*, at 210 and Appendix C.

Second, following this court's decision in *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F.Supp. 1522 (S.D.N.Y.1991) (finding that photocopy business' unauthorized copying of excerpts from books for compilation into university course packets was not a fair use), the CCC received between 1200 to 2000 daily requests for permissions from photocopy businesses. In response, the CCC started the Academic Permissions Service ("APS"). APS is a transactional license program for the purpose of creating course packets and anthologies that is available to copy shops, as well as university copy centers and departments. *See* Ginsburg, *Reproduction of Protected Works* at 210–211.

veloped private annual licensing agreements. For example, AT & T Bell Labs, in addition to its membership in the CCC, has over 200 agreements with publishers covering photocopying with respect to some 350 journals that are not registered with the CCC. Furthermore, publishers have extended photocopying licenses to document delivery services.

In this manner, private cooperative ingenuity has found practical solutions to what had seemed unsurmountable problems. Texaco can no longer make the same claims as were successfully advanced by the NIH to the Court of Claims in 1973. A finding that such unauthorized copying is an infringement would no longer impede the progress of science. Texaco could conveniently, and without undue administrative burden, retain the benefits of photocopying at will, simply by complying with one of the CCC's licensing systems.[23]

Texaco contends that the availability of CCC authorizations is irrelevant to this action. It contends this is so because it needs no authorization if the copying is a fair use. This is so, but it does not support the claim of irrelevance. Texaco's strongest arguments may be that photocopying has become "reasonable and customary," *Nation*, 471 U.S. at 550, 105 S.Ct. at 2225, and that failure to permit it would substantially harm scientific research, as *Williams & Wilkins* found. Those arguments depend, however, on the absence of a convenient, reasonable licensing system. Now because of CCC's licensing arrangements (and the other parallel steps taken by the owner-user communities), those consequences no longer obtain. Reasonably priced, administratively tolerable licensing procedures are available that can protect the copyright owners' interests without harming research or imposing excessive burdens on users. To the extent such photocopying was "customary," it has become far less so as many giant corporate users have subscribed to the CCC systems. To the extent the copy-

ing practice was "reasonable" in 1973, it has ceased to be "reasonable" as the reasons that justified it before the CCC have ceased to exist.

Texaco goes on to argue that because most of the eight Chickering copies selected for this trial were made in 1981 and 1982, prior to the development of the AAS, the court should not consider annual authorizations in assessing the practicality of solutions offered by the CCC. It contends that TRS is unreasonably burdensome; therefore, it argues, this court should conclude, like *Williams v. Wilkins*, that, as of the time of Chickering's copies from *Catalysis* in 1981–82, scientific research would have been harmed if such copying was not a fair use, for lack of any practical lawful way for research scientists to obtain necessary copies.

Texaco's insistence that the court appraise the utility of a CCC license without reference to the AAS invites a perversely struthian adjudication. Furthermore, in view of the fact that at least two of the eight selected Chickering photocopies were made after AAS had become available, it would be completely inappropriate to consider only the TRS and not the AAS. Nor does Texaco contend that photocopying by its scientists has diminished since the establishment of AAS. Chickering's files revealed numerous post–1983 photocopies, as did the files of the few other Texaco scientists that have been examined. The limited evidence supports the conclusion that Texaco's scientists have engaged in large-scale photocopying since CCC's creation of the AAS.

 Nonetheless, even if the issue of fair use as to the six articles copied before the AAS existed were considered on the restrictive terms that Texaco advocates, Texaco would not prevail. I do not accept Texaco's contention that CCC's TRS is too burdensome to qualify as a solution to the licensing problem. Texaco relies on the

---

**23.** Texaco in fact registered with the CCC for a TRS license. That is irrelevant to this decision because of the stipulation limiting the scope of this trial to Texaco's defense of fair use. For purposes of this trial, at least, Texaco does not contend it paid for Chickering's copies. It contends rather than it had no need to report and pay for Chickering's copies because making them was a fair use.

fact that the TRS has not attracted a large corporate following and that a number of users advised CCC they were unwilling to assume the administrative and reporting burdens required by TRS.

This evidence does not prove as much as Texaco contends. The fact that members of the user community negotiated for something more advantageous by no means proves that the TRS was too burdensome to be practical. One must recognize the context in which the negotiations took place. By reason of the *Sony* and *Williams & Wilkins* decisions, the user community was negotiating from a position of considerable strength. *Sony* and *Williams & Wilkins* represented two consecutive victories for the copier side, as against no victories for the copyright owner-publishers. While the CCC systems were being developed, it was thus highly questionable whether industrial scientific photocopying as exemplified here would be held an infringement. If not, the user community would be free to refuse to participate in any licensing system. The fact that under those circumstances users declared in the poker game that they were unwilling to assume the burdens of TRS does not necessarily mean that was true. Much less does it mean that the TRS burdens were unreasonable. What it meant was simply that users employed their bargaining power to negotiate for something they liked better.

Considering the features of the TRS objectively, Texaco has failed to show that they are so burdensome as to be unacceptable. To the contrary, the TRS represents a reasonable practicable solution for the industrial user community. The evidence shows that the administrative burdens for a user complying with TRS are modest and manageable.[24] Texaco has certainly failed to show otherwise.

The availability of a TRS or AAS license from the CCC renders moot the argument that so influenced *Williams & Wilkins* that a finding of infringement would harm science. The acceptance and use of CCC services by large research-oriented business corporations, including eleven major petroleum companies, undermines Texaco's reliance on the contention that unauthorized photocopying is customary and reasonable in private industrial research laboratories.

Exercising imaginative advocacy, Texaco musters a number of other equitable arguments that are superficially seductive but, in the end, unpersuasive. Pointing out that the authors (who are the intended beneficiaries of the copyright law) are not paid for their work and generally favor liberal photocopying rights, Texaco seeks to characterize the publishers as greedy abusers who obtain their merchandise for free, sell it at a high profit and finally seek to stifle scientific research by extorting tribute for photocopying. Virtually every segment of this construct is flawed, illogical and contrary to the principle on which the copyright law is founded.

First, it is misleading to characterize the authors as unpaid. Although it is true that Academic Press and similar publishers do not pay authors money to publish their articles, the authors derive benefit from the publication of their works far more important than any small royalty the traffic might bear. Authors of such scientific and technical material have a substantial economic motivation as well as other interests in having their studies published in prestigious journals. Such publication enhances their professional reputations in a manner that translates itself into remuneration. The remuneration is achieved through growth of prestige and a consequent ability to command greater salaries or more prestigious and powerful positions. *Cf. Weissmann,* 868 F.2d at 1324 ("in an academic setting, profit is ill-measured in dollars. Instead, what is valuable is recognition because it so often influences professional advancement and academic tenure"). It is *by their choice* that authors publish in

---

**24.** Law firms routinely keep a log of all photocopying done and bill clients for such copying on a per-page basis to a specific client-matter code. The recording and reporting requirements of the TRS are scarcely more burdensome.

such journals as *Catalysis,* notwithstanding absence of payment.

 Secondly, the fact that many authors favor a liberal photocopy practice is completely irrelevant, by reason of the fact that these authors have assigned their copyright, and with it, their rights of authorship. It is true that the copyright law grants exclusive rights in their writings *to the authors. See* 17 U.S.C. § 201(a). But by the same token, it grants to authors the power to assign those rights, 17 U.S.C. § 201(d)(1), which they have done. Authors recognize that publishers have little incentive to assume the financial risks of publishing unless the publisher is protected from copying. Accordingly, it is commonplace for authors to assign their rights of authorship to publishers for at least some agreed time on whatever terms may be available. Having made such assignment, the author cannot continue to control the benefits of the copyright.

It is not surprising that authors favor liberal photocopying; generally such authors have a far greater interest in the wide dissemination of their work than in royalties—all the more so when they have assigned their royalties to the publisher. But the authors have not risked their capital to achieve dissemination. The publishers have. Once an author has assigned her copyright, her approval or disapproval of photocopying is of no further relevance.

Finally, Texaco's argument seeks to undermine the publishers' legitimacy in seeking compensation for photocopying by reason of their substantial profits. This argument is both unfounded in fact and wrong as a matter of copyright law. Notwithstanding the evidence of the current prosperity of Academic Press, Texaco has certainly not shown that the publication of scientific materials is a business that commands excessive profits. To the contrary, plaintiffs have shown that the publication of scientific journals requires a large investment and a long period of losses endured in the hope of reaching eventual profitability.

Furthermore, Texaco's attempt to deprecate the interest of the copyright owner by reason of profits it has realized through its copyrights is directly contrary to the theory on which the copyright law is premised. The copyright law *celebrates* the profit motive, recognizing that the incentive to profit from the exploitation of copyrights will redound to the public benefit by resulting in the proliferation of knowledge. Again quoting Madison, "The public good fully coincides ... with the claims of individuals." *The Federalist,* No. 43 at 186. The profit motive is the engine that ensures the progress of science. The principle is admirably demonstrated by the facts of this case. Through its ability to profit from its exclusive rights over the works assigned to it, Academic Press has expanded its range so that it publishes 105 scientific, medical and technical journals. The result is the progress of science; the means is the profit motive, which is underwritten by the law of copyright. Texaco's demagogic effort to undermine the publishers' rights by tarring them as wealthy profiteers [25] carries no force in copyright analysis, which does not begrudge copyright profits.

*Section 108*

 Texaco contends it is entitled to prevail either directly under Section 108 of the Copyright Act, 17 U.S.C. § 108, or on a penumbra of Section 108 reflected in analysis of Section 107. There is no merit to these arguments.

Section 108 authorizes library photocopying under narrowly specified circumstances. The circumstances do not apply. Section 108 is made applicable only "if the reproduction ... is made without any purpose of direct or indirect commercial advantage." 17 U.S.C. § 108(a)(1). As noted above, Texaco makes the photocopies solely for commercial advantage. Texaco's $80 million dollar annual budget for scientific research, of which its photocopying represents a microscopic part, is not expended as an exercise in philanthropy. It is done for profit. Articles are photocopied to help

**25.** It is an odd argument, furthermore, to be made by an oil company that reported over $2.4 billion net income for fiscal 1989 on revenues of over $32 billion.

Texaco's scientists in their profit-motivated research.

Secondly, Section 108 permits the making of "no more than one copy." (Presumably this means one to a customer rather than an absolute limit of one.) A library that qualifies under § 108 could deliver a maximum of one copy of a particular item to Texaco. Assuming that Texaco's Beacon library can qualify as a library under Section 108, it does not comply with this restriction. Virtually all the copies it prepares are for Texaco. If Chickering obtains a copy of an article, there is no procedure barring his Texaco colleagues from copying the same article. In all likelihood, numerous Texaco scientists make copies of the same articles when they pertain to matters that are important for Texaco's research. Nor is there even any procedure in place limiting a single Texaco scientist to a single copy.[26]

Nor can Texaco prevail in its argument that the understanding of Section 107 should be influenced by what is permitted under Section 108. For Section 108 expressly provides that "Nothing in this section ... in any way affects the right of fair use as provided by section 107...." 17 U.S.C. § 108(f)(4).

*Failure of Publisher–Members of CCC to Secure Valid Copyright Assignments*

Texaco contends that in some instances the publisher-members of the CCC have failed for a variety of reasons to secure valid copyright assignment from authors, but, nonetheless, claim entitlement to receive royalties for photocopying. To the extent Texaco is raising such failure as a defense to plaintiffs' claims for damages in this suit, it is not part of the stipulated trial of the fair use issue. To the extent Texaco claims the possibility of such failure affects the question of fair use, Texaco's contention is remote and conjectural. Texaco has failed to make any showing sufficient to

affect the court's conclusion on the issue of fair use.

*Explicit Acknowledgement by Section 107; Other Points*

Texaco emphasizes that the introductory passage of Section 107 expressly contemplates that "reproduction in copies" can qualify as a fair use. This opinion is not to the contrary. It recognizes that photocopying can be transformative in numerous circumstances, and can also qualify under *Sony* in a not-for-profit context, as well as by threatening no harm to the copyright owner's market, or by reason of other equitable considerations. The circumstances that could make a photocopy a fair use are not present here.

Texaco's other points are without merit.

### Conclusion

The court finds that Texaco's photocopying of eight articles from the *Journal of Catalysis* for use by Donald H. Chickering, II, was not fair use under § 107 of the Copyright Act of 1976.[27] As to those articles, judgment is awarded to the plaintiffs on Texaco's affirmative defense of fair use.

SO ORDERED.

### OPINION AND ORDER ON ALLOWANCE OF REQUEST FOR IMMEDIATE APPEAL

Oct. 26, 1992.

■ Defendant Texaco seeks an order pursuant to 28 U.S.C. § 1292(b) allowing it to request immediate appeal of this court's finding against Texaco on its defense of fair use.

### Background

This is a class action, brought by numerous publishers of scientific and technical journals, to test whether it is lawful under the U.S. Copyright Act, 17 U.S.C. § 101, *et*

---

**26.** It is also questionable whether lawfulness under Section 108 comes within the scope of this trial which, by stipulation, covers only the issue fair use. Fair use is covered by Section 107. Section 108 is a separate special statutory exemption governed by an entirely different set of standards.

**27.** The parties disagree as to which side bears the burden of proof of fair use. I do not rule on the question as my findings and conclusions would be the same in either case.

seq., for a business corporation to make unauthorized copies of copyrighted articles for use by the company's scientists employed in profit-motivated scientific research. Plaintiffs contend that by its photocopying Texaco infringed plaintiffs' copyrights. In answer to the complaint, Texaco raised the defense, among others, of "fair use" under 17 U.S.C. § 107.

Prior to the trial of any other issues, the parties stipulated that trial would be submitted to the Court on a written record limited to the question whether Texaco's photocopying constituted fair use. The parties also stipulated that, to avoid unnecessary discovery expenses, the fair use trial would be conducted with respect to the photocopies found in the files of an arbitrarily selected one of Texaco's several hundred scientific researchers. In addition the parties stipulated that, if Texaco's claim of fair use as to these articles is sustained, then all of plaintiffs' claims of copyright infringement will be dismissed with prejudice. *See* Op. at 5 & n. 1.

Trial was conducted on a voluminous submitted record including 31 volumes of testimony and exhibits. An opinion and order of July 22, 1992 delivered the findings of the court concluding that the photocopying at issue was not fair use.

### Discussion

Section 1292(b) states, in pertinent part, When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. 28 U.S.C. § 1292(b). For the reasons that follow, I am of the opinion that this circumstance meets the criteria of § 1292(b).

First, the finding clearly "involves a controlling question of law." By reason of the stipulation, an appellate ruling that the photocopying was fair use would terminate the action. *See Klinghoffer v. S.N.C. Ac-hille Lauro,* 921 F.2d 21, 24 (2d Cir.1990) ("'a question of law is 'controlling' if reversal of the district court's order would terminate the action"). Furthermore, it appears (and the parties agree) that a decision of the Court of Appeals affirming this court's finding would make overall settlement likely. *See 9 Moore's Federal Practice* ¶ 110.22[2], at 260 (1988) ("The critical requirement is that [the issue] have the potential for substantially accelerating the disposition of the litigation.") In contrast, if Texaco is not permitted to take an appeal from this court's ruling, the parties and the court will be obliged to face voluminous unnecessary litigation of the claims of 84 plaintiffs, including innumerable technical defenses. As to thousands of allegedly copyrighted articles and letters, the parties would be required to discover and litigate thousands of discrete questions involving authorship, government or university employment of authors, assignment, and consent. Discovery and trial of these issues would consume vast amounts of expense and time for the parties. Trial could occupy the court for many months. It appears highly likely that all of this expense and litigation would be wasted; it would probably never occur if the Court of Appeals permitted immediate interlocutory appeal of the district court's findings on the issue of fair use.

I also find that appellate review is altogether appropriate at this juncture. The issue of fair use, as to the practices of a representative Texaco researcher, was fully tried on a voluminous record. That record contains the evidence the Court of Appeals will require to adjudicate the question of fair use.

Section 1292(b) further requires the district court to find that there is "substantial ground for difference of opinion" on the ruling being appealed. Although it is my belief that the Court of Appeals will affirm my ruling, I must acknowledge that the area of fair use is one which spawns enormous differences of opinion. Litigation of fair use questions has resulted in numerous reversals of district courts by courts of appeals, and of courts of appeals by the

Supreme Court. Generally speaking, the decisions of the Supreme Court on fair use have not formulated a clear framework or standard governing future cases.

Furthermore, as to the particular issue in litigation, there is no controlling precedent. The closest fact pattern, in *Williams & Wilkins Co. v. United States*, 203 Ct.Cl. 74, 487 F.2d 1345 (1983), resulted in a decision that is arguably in tension with this court's decision. The issue in *Williams & Wilkins* split the Supreme Court 4–4. 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1985).

I can only conclude that there is substantial ground for a difference of opinion.

Finally, the parties suggest, and I agree, that there is a strong public interest in having prompt appellate review of the fair use issue presented in this case. It appears that photocopying of copyrighted scientific material is extremely widespread in commercial research-oriented profit-motivated companies. There is substantial uncertainty in the user and publisher communities as to whether such photocopying is protected by the fair use doctrine or whether it requires consent or gives rise to a right to compensation. The shared interests of large research corporations and the publishing community would be importantly served by an immediate appeal, clarifying these questions.

Accordingly, I find that the requirements of 28 U.S.C. § 1292(b) are met and urge the Court of Appeals to accept the appeal of this otherwise unappealable ruling.

### ORDER

For the reasons set forth above:

(1) The court hereby amends the Opinion and Order dated July 22 and filed on July 23, 1992, as amended by the Orders filed on July 27, 1992 and July 29, 1992, to incorporate this order (the consolidated orders being referred to below as the Order).

(2) The court is of the opinion that the Order involves a controlling question of law, whether the photocopying at issue is fair use, as to which there is substantial ground for difference of opinion and that

immediate appeal from the Order may materially advance the ultimate termination of the litigation.

SO ORDERED.