Stanley **COHEN**, Gerald A. **Garfinkle** and Eastern Artists and Drafting Materials, Inc., Plaintiffs,

v.

Elliot **KOENIG** and Robert **Koenig**, Defendants.

No. 92 Civ. 4463 (SAS).

United States District Court, S.D. New York.

Feb. 27, 1996.

Gary J. Langer, New York City, for Stanley Cohen, Gerald A. Garfinkle, Eastern Artists and Drafting Materials, Inc.

Regina A. Matejka, Edwards & Angell, New York City, Lisa K. Morgan, Hebb & Gitlin, Hartford, CT, for Elliott Koenig, Robert Koenig.

Lisa K. Morgan, Hebb & Gitlin, Hartford, CT, for David Cousins, Blum, Shapiro & Company, P.C., Victoria M. Bittner, Bernard Blum, Peter A. Bourdon, Steven W. Caldwell, Adam P. Cohen, Benjamin E. Cohen, Bernard M. Cohen, Lawrence C. Davis, Morton H. Gavens, Seymour Gavens, Steven M. Guest, Douglas A. Joseph, Frederick J. Kaplan, Conrad A. Kappel, Diane V. Libby, Alan Mandell, Alfred Rosenthal, Marshall A. Rulnick, Lawrence H. Rustin, Michael A. Samartino, Julius S. Shapiro, John D. Spatcher.

## OPINION AND ORDER

SCHEINDLIN, District Judge:

### I. BACKGROUND

In early 1989, the Koenig Corporation sought to acquire the assets of Eastern Artists and Drafting Materials, Inc. After some negotiation, the Koenig Corporation agreed to purchase Eastern's assets on a part cash, part credit basis. In March 1991, before all the payments were made, the Koenig Corporation filed for bankruptcy under Chapter 11 of the Bankruptcy Code.

Plaintiffs Stanley Cohen ("Cohen"), Gerald Garfinkle ("Garfinkle") and Eastern Artists and Drafting Materials, Inc. ("Eastern") are now suing Elliott and Robert Koenig, the principals of the Koenig Corporation, alleging fraud in connection with the Koenigs' purchase of the assets of Eastern. Plaintiffs allege that the Koenigs made fraudulent misrepresentations in two respects: First, that the Koenig Corporation's financial statement was certified and set forth a true and accurate depiction of the sound financial condition of the Koenig Corporation. *Cohen v. Koenig,* 25 F.3d 1168, 1170 (2d Cir.1994) (quoting the Amended Complaint ¶ 24). Second, that the Koenig Corporation's "financial condition had substantially improved for the year since the last period covered by the [f]inancial [s]tatement," and that specifically its "net income

would be substantially greater for the year about to end on June 30, 1989." *Id.*

The Court held a bench trial from December 12 to December 21, 1995, from which the following findings of fact and conclusions of law are made.

## II. FINDINGS OF FACT

### A. The Sale and Purchase of Eastern

Defendants Robert and Elliott Koenig were officers, directors, controlling shareholders and employees of the Koenig Corporation.[1] Since 1933, the Koenig Corporation had been in the business of selling and distributing artist and drafting supplies and materials, both at wholesale to its franchisees and at retail through company-owned stores. By all accounts, the Koenig Corporation was one of the largest and most successful art supply businesses in the United States. In 1981, the Koenig Corporation owned just nine art supply stores, when then-President Elliott Koenig decided to begin franchising. By 1990, the Corporation had roughly 125 stores (including both company-owned and franchised stores), whose estimated $100,-000,000 combined business represented approximately 10% of the total art supply industry in the country.

Prior to June 1, 1989, Plaintiffs Cohen and Garfinkle were the sole officers, directors and shareholders of Plaintiff Eastern, a company similarly engaged in the business of selling artist and drafting supplies. Eastern owned one store, located in midtown Manhattan, which enjoyed an average of approximately $5 million in net sales over the previous two years.

In February 1989, Tony Parete, a representative of the Koenig Corporation, contacted Cohen and Garfinkle to inquire about the

possibility of purchasing the assets of Eastern. Parete explained to Cohen and Garfinkle that the Koenig Corporation specifically wanted to establish a base of operations in New York City. For despite having stores in a number of major metropolitan areas, such as Philadelphia and Chicago, the Koenig Corporation neither owned nor franchised a store in New York City at that time.

On February 24, 1989, Plaintiffs met with Robert Koenig and Tony Parete at Eastern's office. At that meeting, Robert Koenig proposed that the Koenig Corporation acquire Eastern's assets.[2] Robert Koenig explained the Koenig Corporation's plans to make a public offering, and reiterated the company's view that a New York location was critical to its future success.

Sometime after the February meeting, the Koenig Corporation sent Plaintiffs its most recent certified financial statement, covering the fiscal year ending June 30, 1988 ("Financial Statement"). Among other things, the Financial Statement reported that the Koenig Corporation's net income for the fiscal year ending June 30, 1988 was $1,035,139. The Plaintiffs carefully reviewed the Financial Statement.[3]

The parties held subsequent meetings on April 1, April 10, and May 17 to further discuss the proposed purchase of Eastern's assets. At each of these meetings, one or both of the Koenigs boasted of the Corporation's improving sales and recent acquisitions, and asserted that the acquisition of Eastern would solidify its position as the largest American company in the field of artist and drafting supplies and materials.

After some negotiation, the parties agreed on a purchase price of $2,850,000. One of the parties—there is conflicting testimony over

---

1. Koenig Corporation had a number of subsidiaries, namely Koenig Artist Supplies, Inc., Koenig Management Services, Inc. d/b/a Koenig Art Emporium, Koenig Realty Corp., and Art Management Services, Inc. I will collectively refer to these entities as "Koenig Corporation."

2. The assets would include inventory, accounts receivable, good will, and the lease associated with Eastern's New York City store.

3. In fact, Garfinkle testified he was particularly impressed when he learned that the Koenig Cor-

poration's income had tripled from the previous year and was now over $1 million, and that sales had almost doubled from the year before. He testified that "[i]t apparently was true with everything that Elliott and Robert [Koenig] were saying ... about the business. It really was true. They were moving, and their picture appeared on the cover of our association magazine many times as a company on the move. They were really celebrities." Trial Transcript ("Tr.") 74.

which—pressed for an all cash transaction. Regardless, the parties eventually agreed to an asset purchase on a part cash, part credit basis, whereby the Koenig Corporation would pay $1,850,000 at closing, and the balance over a four-year period. Towards the end of the negotiation process, Plaintiffs requested that the Koenigs personally guarantee the future payments, which the Koenigs refused to seriously consider. Plaintiffs' concerns in this regard were somewhat allayed by Elliott Koenig's statement that investors would provide the initial monies to pay Eastern.

On June 1, 1989, the purchase was completed after the final issue—the personal guarantee from the Koenigs—was resolved. Cohen and Garfinkle agreed to abandon their demand, in part due to the strength of the Financial Statement and in part because of the Koenigs' individual reputations in the art supply industry. As provided by the Agreement Of Sale, the Koenig Corporation made an initial cash payment of $1,550,000 at the closing (Ex. 1). In addition, each Plaintiff received $150,000 at closing in return for a five-year covenant not to compete ("Covenants") (Ex. 1).[4] Thus, as agreed, $1,850,000 was paid to Plaintiffs at the closing. The Koenig Corporation also agreed to repay a number of loans made to Eastern by Cohen and Garfinkle over the years totalling $644,-000, to be paid in monthly installments over four years at a rate of 7.7% interest compounded annually (computing to $7,815.70 monthly and totalling $750,000) ("the Promissory Note") (Exs. 2,3,4,5). Finally, to account for the remaining sum, the Koenig Corporation agreed to pay $31,250 annually each to Cohen and Garfinkle for four-year consulting contracts (totalling $250,000) ("Consulting Agreements"). This final piece of the transaction price was structured in this way specifically to reduce the income tax liability of the Plaintiffs.

## B. The Errors in the Financial Statement

Approximately one year later, in June, 1990, Koenig Corporation Chief Financial Officer David Geller ("Geller") began to suspect that the Fiscal Year 1988 financial statement was incorrect, due to a wide disparity in profit from the previous year.[5] Geller believed there may have been two errors in the Financial Statement. The first involved the valuation of inventory purchased in 1987 as part of the acquisition of an art supply store chain. The second involved the proper method of allocating costs when reacquiring a store from a former franchisee.

### 1. The "Favor Ruhl" Acquisition and the Valuation of Inventory

Favor Ruhl was a chain of art supply stores centered in Chicago, Illinois.[6] In early 1987, Koenig acquired the assets of Favor Ruhl from Robsac Industries, which was then in bankruptcy, for approximately $2.4 million. The assets included the inventory, furniture and fixtures at each location.

According to Defendants' expert witness Alphonse Ferrara, in accounting jargon, the Favor Ruhl acquisition was considered a "bargain purchase." Tr. at 791. A bargain purchase occurs when the consideration paid for a business is less than the fair market value of its assets. *Id.* at 792–3. In this case, the Koenig Corporation acquired an estimated $4 million worth of assets for approximately 60 cents on the dollar.

The Generally Accepted Accounting Principles ("GAAP") establishes that the proper method for allocating the assets of a bargain purchase is to first allocate the purchase price to inventory, based on its actual value, and to allocate the remainder to fixed assets and other non-current assets. *Id.* at 793. If the value of the inventory is greater than the

---

4. The Covenants included the following geographic area: the City of New York, Nassau, Suffolk, Rockland and Westchester counties in New York State, and Bergen, Essex, Middlesex and Somerset counties in the State of New Jersey (Ex. 10).

5. Koenig Corporation's net income for the year ended June 30, 1989 was calculated at only

$107,251, as opposed to a purported net income of $1,035,139 the previous year as indicated in the Financial Statement.

6. In addition to Chicago, Favor Ruhl had stores in Detroit, Michigan, Bloomington, Indiana, Brick, New Jersey and Newark, New Jersey.

total price of the deal, the difference is placed in a "deferred income" credit account, to be realized over several years.[7] *Id.* at 794. According to Robert Sachs, former President of Robsac Industries, Robsac valued Favor Ruhl's inventory at $2.8 million at the time of its sale to the Koenig Corporation. The Koenigs felt that because much of the Favor Ruhl inventory was obsolete or outmoded, this figure was overstated.[8] In fact, in a letter sent to Connecticut National Bank for the purpose of encouraging the Bank to extend credit to the Koenig Corporation, Elliott Koenig valued the Favor Ruhl inventory at approximately $1.55 million (Ex. 81 Att. G).

The Koenig Corporation's accountants, Blum, Shapiro & Company ("Blum"), erroneously decided that this GAAP provision did not apply to pure asset sales such as the Favor Ruhl purchase. Instead, Blum calculated a ratio based upon the fair market value of each purchased asset and allocated the purchase price proportionately. The net result was that the inventory was undervalued and recorded on the Koenig Corporation books at a value of $649,000.[9]

### 2. The Reacquisition and Valuation of Koenig Corp. Franchises

Periodically, franchisees decided to leave the art supply business and would sell their franchise back to the Koenig Corporation. Under GAAP, when reacquired stores are related to the reacquirer[10], the purchaser must record the cost of repurchase at the lower of the store's original cost[11] and its fair market value.

Contrary to the GAAP provision, Blum treated these transactions as if the reacquired franchises were unrelated entities, and thus incorrectly recorded the cost of these stores at the price paid at reacquisition. This had the effect of overstating the value of the Koenig Corporation's current assets.

### C. The Restatement of the Financial Statement

In connection with its plan to make a public offering, the Koenig Corporation retained the accounting firm Deloitte & Touche. As part of its overall review of the Company's financial condition, Deloitte & Touche reached the conclusion that the Financial Statement contained the aforementioned two errors. As a result, Deloitte & Touche determined that in order to make a public offering, the Koenig Corporation would have to issue a restated financial statement. On the advice of Deloitte & Touche, the Koenig Corporation contacted Blum and asked it to examine the Financial Statements for errors. Blum eventually agreed with Deloitte & Touche and concluded that the Financial Statement would have to be restated.

First, Blum agreed that the Favor Ruhl inventories were incorrectly valued. Koenig Corporation had paid less than fair market value for the stores' inventory. Nonetheless, it recorded the value of the inventory as a percentage of the price paid, rather than at

---

7. It is fundamental that the purchase price is used to establish the basis of the acquired property for taxation and accounting purposes. Under normal conditions, the purchase price is allocated among each item included in the purchase based upon estimated market value, with any excess allocated to "good will" or some similar account. Logically, this method cannot be used for bargain purchases, for it would create a dilemma: by using fair market values, the purchaser would effectively realize income simply by conducting the transaction, despite the fact that under general taxation principles, the purchase of property is not a taxable event.

8. There is some evidence to suggest that since Favor Ruhl was receiving bank loans using the inventory as collateral, it had an incentive to inflate the inventory value, and therefore its estimates cannot be considered unbiased.

9. Undervaluing inventory has the effect of increasing income once that inventory is sold, i.e., once the cost of the inventory is decreased, the reported profit margin (along with gross profit) increases proportionately.

10. When related stores are repurchased, there cannot be a presumption that the transaction was made at arm's length. Here, the Koenig franchises were considered related because they regularly bought their inventory directly from the Koenig Corporation.

11. The original cost of the store is calculated by its original construction costs, the cost of the original inventory, and other miscellaneous items.

its actual value. At the end of the year, when the inventories were actually counted, the purported increase in inventory (due solely to the under-reporting of the value of the inventory purchased) was incorrectly recorded as profit. Second, the reacquired franchises were incorrectly carried at their repurchase cost.

Blum agreed to issue a restatement to account for the errors (Ex. 14). The major impact of that restatement was to reduce net income and net assets by $709,000 and to reallocate an additional $780,000 to inventory. Specifically, under the restatement, the value of the *Stores held for resale* account for the fiscal year ending June 30, 1988 was calculated at $1,730,096, which was $540,000 less than the originally stated amount; the *net property and equipment* account was restated at $3,311,528, which represented a reduction of $650,000; and the *net income* account was now reported at only $326,139, an amount $709,000 less than that set forth in the Financial Statement.

### III. CONCLUSIONS OF LAW

[W]ith all due respect to my profession, this is accounting. It doesn't effect the company's ability to settle its debts. It does not impact its ability to open up stores.

—Testimony of Expert Witness Alfonse Ferrara, Tr. at 805.

Plaintiffs allege that Elliott and Robert Koenig repeatedly and intentionally overstated the Koenig Corporations' net income, the value of its current assets and the value of its property and equipment in order to induce Cohen and Garfinkle to extend credit to them to purchase Eastern's assets.

■ In order to prevail on a claim of fraudulent misrepresentation under New York law, the plaintiff must show that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland National Bank,* 57 F.3d 146, 153 (2d Cir.1995); *Keywell Corp. v. Weinstein,* 33 F.3d 159, 163 (2d Cir.1994). Furthermore, each element must be shown by clear and convincing evidence. *Banque Arabe,* 57 F.3d at 153; *Sado v. Ellis,* 882 F.Supp. 1401, 1405 (S.D.N.Y.1995); *Citicorp Int'l Trading Co. v. Western Oil & Refining Co.,* 790 F.Supp. 428, 435 (S.D.N.Y.1992). The failure of any single element will void the claim of fraud. *Congress Financial Corp. v. John Morrell & Co.,* 790 F.Supp. 459, 469 (S.D.N.Y.1992). While generally under New York law the officers and directors of a corporation cannot be held individually liable for their company's obligations, "officers and directors of a corporation may be held liable for fraud if they participate in it or have actual knowledge of it ..." *People v. Apple Health & Sports Clubs, Ltd.,* 80 N.Y.2d 803, 807, 587 N.Y.S.2d 279, 282, 599 N.E.2d 683, 686 (1992).

Plaintiffs allege that Defendants made two types of misrepresentations. First, that Defendants made oral statements during the negotiation process concerning the recent and expected performance of Koenig Corporation. Second, that Defendants knew of and possibly orchestrated the errors in the Financial Statement, upon which Plaintiffs innocently relied when agreeing to sell the assets of Eastern on a partial credit basis.

#### A. The Oral Misrepresentations

Plaintiffs allege that Defendants orally misrepresented the 1989 expected net income of the Koenig Corporation during the negotiation process. They further allege that they would not have agreed to sell their business on a part credit basis had they known the Koenig Corporation's true net income.

■ While statements will not form the basis of a fraud claim when they are mere puffery or opinions as to future events, *see, e.g., Quasha v. American Natural Beverage Corp.,* 171 A.D.2d 537, 537, 567 N.Y.S.2d 257, 257 (1st Dep't 1991), "a relatively concrete representation as to a company's future performance, if made at a time when the speaker knows that the represented level of performance cannot be achieved, may ground a claim of fraud." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994).

■ While I am convinced that both of the Koenigs made statements concerning the financial strength and projected future performance of the Koenig Corporation, there is no evidence that such representations were specific enough to constitute fraud. As evidenced by his trial testimony, Elliott Koenig, in particular, will take every opportunity to boast about his, and his company's, many accomplishments. During negotiations, Elliott Koenig undoubtedly boasted of the recent performance of the Koenig Corporation, and commented that the company's performance would continue to improve the following year. Although Plaintiffs maintain that Elliott Koenig, in particular, specifically stated that net income would improve, there is no concrete evidence to support this allegation.

Broad statements that a company's performance will continue to improve do not give rise to fraud. It is unclear whether improved performance relates to sales, equity or revenue. For example, if the Koenigs were referring to sales, the 1989 performance exceeded 1988 by over $4 million. Shareholder equity increased from $7.5 million (the restated figure) to over $8.6 million. Finally, current assets increased from $20 million (the restated figure) to $24 million. However, Plaintiffs argue that regardless of the specificity of the representations, the only appropriate measure of performance is net income, which decreased markedly in 1989.

Where, as here, a company is in an expansionist mode, net income is not an accurate barometer of the firm's overall health. *See* RICHARD A. BREALEY & STEWART C. MYERS, PRINCIPLES OF CORPORATE FINANCE Ch. 12 (4th ed. 1991) ("Brealey & Myers"). According to Brealey & Myers, when a firm is aggressively investing funds in new stores or equipment, it will typically experience a temporary reduction in book earnings. This does not indicate that the firm's overall value has decreased. Indeed, if the investment is ultimately profitable, firm value will have *increased*. Net income will not expose this increase in value, because it concentrates on cash flows, instead of measuring the long-term value of the firm. To illustrate this point, Brealey & Myers provide the real-life example of Polaroid Corporation.

> Its earnings dropped sharply in the early 1970s because of heavy development expenditures on the SX–70 instant camera, which was successfully introduced in 1973. If investors looked only at the latest earnings announcement, they would have concluded that Polaroid was in big trouble in 1972. In fact, they understood *why* earnings were low and acted accordingly.

Brealey & Myers at 276 (emphasis in original).

Similar conditions existed in 1988–89 for the Koenig Corporation, although it was expanding its stores rather than developing a new product. New stores require significant initial investment and time before sales can increase to a level permitting self-sufficiency. Inventory must be purchased, not only for new stores, but for existing stores such as those in the Favor Ruhl chain which may be carrying obsolete inventory. Testimony clearly established that the Koenig Corporation was expanding at an unprecedented rate. This testimony is confirmed by a cursory review of the restated financial statement. For the year ending June 30, 1988, Koenig Corp. invested over $3.6 million, as compared to under $1.4 million the previous year. In addition, Koenig Corp. incurred $520,311 in depreciation expenses, up from $271,678 for the previous year, indicating that the firm increased its holdings of depreciable assets (Ex. 14).

The Koenig Corporation's primary investors recognized that the reduction of net income was not an indication of the firm's recent performance, as evidenced by their willingness to invest additional funds in the firm despite the restated net income. Thus, Plaintiffs' insistence that net income is the only relevant measure of a firm's performance has no merit. I therefore hold that the Koenigs did not commit fraud with regard to the oral representations during the negotiations.

*B. The Written Misrepresentations (the Financial Statement)*

■ The second allegation of fraud concerns the accuracy of the Financial State-

ment. "Misrepresentations regarding financial statements must be not only false, but definite and certain, and must involve more than expressions of opinion or statements concerning future happenings, in order to give rise to an action for fraud." *Carte Blanche (Singapore) v. Diners Club Int'l*, 758 F.Supp. 908, 915 (S.D.N.Y.1991).

■ As set forth above, the first element of fraudulent misrepresentation is that there has been a "material false representation." To be considered material, "a reasonable man would attach importance [to the facts misrepresented] in determining his choice of action in the transaction in question." *Congress Financial Corp.* 790 F.Supp. at 470 (quoting *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965)).

■ It is apparent that under this standard, both errors in the Financial Statement were *material.* Although a high net income is not necessary for a company to be able to repay a loan—a company may just as simply settle its debts by taking bank loans or attracting outside investors—there is little doubt that net income remains a major factor in the lender's analysis and decision to extend credit. As the errors in the Financial Statement had a significant impact on the net income figure, I find that a reasonable person's "choice of action in the transaction in question" would be detrimentally affected by such a misstatement.

Similarly, the record clearly reflects that Plaintiffs *relied* heavily on the Financial Statement, particularly the areas of Current Assets and Net Income, when deciding to extend credit to Defendants. In particular, Cohen and Garfinkle abandoned a demand for a personal guarantee provision from the Koenigs, based in part on the strength of the Koenig Corporation's Financial Statement. Such reliance was reasonable given that the Financial Statement was certified by a reputable accounting firm. Plaintiffs would not have entered into this transaction had they been aware of the actual recent performance of the Koenig Corporation instead of being misled by the false information contained in the Financial Statement.

It is also self-evident that Plaintiffs *suffered damage* as a result of their reliance on the Financial Statement. When the Koenig Corporation filed for bankruptcy in 1991, its assets were insufficient to pay any of the amounts owed to unsecured creditors, including the Plaintiffs. As a result, Eastern was never paid $488,613 of the purchase price. Because the Plaintiffs entered into the transaction—not to mention on a part credit basis—based upon the representations in the Financial Statement, I find that a causal relationship exists with regard to their reliance on the Financial Statement and the damages incurred.

Thus Plaintiffs are left with the burden of showing the final element of fraudulent misrepresentation: that Defendants *intended* to defraud the Plaintiffs. Plaintiffs allege that Elliott and Robert Koenig intentionally misrepresented the true facts to their accountants with regard to the income of the Koenig Corp., and thus they knew that the figures stated on the financial statement were erroneous. This alleged fraud was purportedly committed so that the Koenigs could improve the overall financial picture of the Koenig Corporation, in order to make a public offering. Thus, in order to credit these allegations, I must find that the alleged fraud was perpetrated on banks and sophisticated investors as well as Plaintiffs. I do not believe this was the case.

It is undisputed that Elliott Koenig was a hands-on manager who kept abreast of the company's financial condition. Both Koenigs, in fact, were familiar with the company's finances and were interested in its profitability as well as how items were recorded on the financial statements. However, such interest does not imply fraud. Neither Elliott nor Robert Koenig is a certified public accountant, or even enjoy an accounting background. It is quite different to keep abreast of a firm's sales and finances than to understand the esoteric accounting principles discussed in this Opinion. As the testimony revealed, even professional accountants disagreed as to how these items should have been reflected in the financial statements.

The Koenig Corporation's Chief Financial Officer, David DeMeo ("DeMeo") [12], initially compiled the financial information using what he believed to be the correct methodology. Like the Koenigs, DeMeo was not an accountant. Once DeMeo had compiled the information, it was given to the firm's independent accountants, Blum. Only after Blum had reviewed and independently tested the financial information to its satisfaction did it then certify the Financial Statement. This includes the Favor Ruhl asset allocation figures provided by the Koenig Corporation, which Blum checked carefully before certifying the Financial Statement.

Additionally, the methodology used to value the stores held for resale was also approved by Blum. The Koenig Corporation's accounting methodology for repurchased franchises was in place for many years before the events at issue here. No one at the Koenig Corporation ever thought about changing this methodology until August, 1989—well after the purchase of Eastern.

The Plaintiffs rely heavily on the fact that Elliott Koenig overestimated the value of the Favor Ruhl inventory for the purpose of encouraging Connecticut National Bank ("Bank") to lend money using the inventory as collateral. On July 24, 1987, Elliott Koenig sent a letter to the Bank in which Koenig represented the value of Favor Ruhl's inventory to be approximately $1.55 million. The Plaintiffs point out that because the Financial Statement later valued the inventory at $649,000, Elliott Koenig had to know this figure was erroneous, *regardless* of what accounting principle was being used.

I disagree. When Elliott Koenig represented this figure to the Bank, Koenig Corporation did not yet own Favor Ruhl—it was acting as the debtor-in-possession. During the following months, much of Favor Ruhl's obsolete inventory was sold off at greatly reduced prices and not replaced by new inventory. When the Koenigs actually purchased Favor Ruhl in October, the value of its inventory had decreased substantially. Thus, these two different valuations of the Favor Ruhl inventory do not imply fraud.

Finally, Defendants made a very persuasive argument regarding their tax liability. The Koenig Corporation initially paid federal income tax on the originally calculated net income of $1,035,139. Based upon the restated net income, Defendants had significantly overpaid their taxes. If the fraud alleged here was part of an overall scheme to defraud banks and investors, then the Koenigs must have decided that the benefit from conducting such a fraud outweighed the additional tax consequences. Thus, the Koenigs would necessarily have planned this "scheme" before June 1988, when the Financial Statement was prepared.

This does not make sense. There are many variables involved in planning a public offering. It is not unusual for a company to forego a public offering for any number of reasons. Thus, I do not believe that a company overpaid its taxes by tens of thousands of dollars to heighten the possibility of making a public offering more than two years later. In addition, there is evidence to suggest that the restatement—specifically, the *reduction* of the firm's net income—was actually a *positive* development for the company. Because the reported profit was artificially high in 1988, 1989's net profit seemed too low in comparison. For a company about to go public, it is far better to show a steady increase in profit rather than report a wide disparity from year to year. For these reasons, I do not believe that the errors in the Financial Statement were committed as part of an overall scheme to defraud investors and lending institutions.

The Plaintiffs may very well have been the victims of accounting malpractice, but this is not the issue before the Court. I am solely concerned with whether the Defendants, Elliott and Robert Koenig, *intended* to defraud the Plaintiffs through misstatements in their firm's financial statement. The evidence presented during this trial does not establish such an intent by the required standard of clear and convincing evidence. The Koenigs reasonably relied on the information and analysis given them by their CFO and their independent accountants. The principals of a corporation do not have the duty to person-

12. DeMeo preceded Geller as CFO of the Koenig Corporation.

ally review the work and conclusions of the professionals employed specifically for this purpose, especially where their knowledge and expertise is minimal in comparison to that of their accountants.

## IV. CONCLUSION

For these reasons, Plaintiffs have not sustained their burden of providing "clear and convincing" evidence of fraud. Therefore, this action is dismissed with prejudice.

SO ORDERED.