Berke, et al. v. Presstek, et al.    CV-96-347-M   03/30/99

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Bill Berke, et al.,
    Plaintiffs

v.                                    Civil No. 96-347-M
                                      MDL No. 1140

Presstek, Inc., et al.,
    Defendants

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Plaintiffs bring this potential class action,[1] on behalf of all persons who purchased or otherwise acquired the common stock and/or options to purchase the common stock of defendant Presstek, Inc. ("Presstek") between November 7, 1995, and June 20, 1996, inclusive (the "Class Period"), against Presstek and a number of its officers and directors (the "individual defendants").[2] Plaintiffs allege violations of Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78(j)(b), 78t(a) and 78t-1), Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5), and New Hampshire common and statutory law. Presently before the court is defendants' renewed motion for summary judgment regarding plaintiffs' "accounting deficiency" allegations.

---

[1]A class has not yet been certified.

[2]The individual defendants are Robert Howard, Lawrence Howard, Richard C. Williams, Robert E. Verrando, Frank G. Pensavecchia, Glenn J. DiBenedetto, Bert Depamphilis and Harold N. Sparks.

## Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party carries its burden, the burden shifts to the nonmoving party to demonstrate, with regard to each issue on which it has the burden of proof, that a trier of fact could reasonably find in its favor. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).

At this stage, the nonmoving party "may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial. Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). In this context, "a fact is 'material' if it potentially affects the outcome of

the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

## Background

At issue is Presstek's accounting for tax benefits resulting from the exercise of non-qualified stock options. The following facts are alleged in plaintiffs' Second Consolidated Amended Class Action Complaint. In preparing Presstek's 1993 financial statements, defendant DiBenedetto, Presstek's Chief Financial Officer, obtained advice from the company's auditor, Deloitte & Touche ("Deloitte"), regarding correct accounting treatment of exercised stock options. Deloitte advised DiBenedetto that for federal income tax purposes, Presstek could offset the tax benefits from such options with net operating losses ("NOLs") from non-stock compensation. Presstek had enough NOLs in 1993 to entirely offset, for federal tax purposes, the tax benefits from exercised stock options. Deloitte informed Presstek, however, that because New Hampshire limited the use of NOLs, Presstek should record a charge in lieu of taxes for New Hampshire tax purposes only, with an offsetting credit to additional paid-in capital.

With respect to Presstek's 1994 financial statements, DiBenedetto asked Deloitte to confirm its previous advice, which

3

it did.  Presstek again had sufficient NOLs in 1994 to entirely offset the stock option benefits for federal tax purposes.

In January 1996, Presstek retained BDO Seidman ("BDO") as its auditor.  In preparing the 1995 financial statements, DiBenedetto requested BDO's own advice regarding the stock option issue, having informed BDO of the advice Deloitte previously gave.  BDO agreed with Deloitte's advice and counseled Presstek to follow it again in 1995.

In April 1996, Presstek again sought BDO's advice regarding correct treatment of exercised stock options, because Presstek no longer had NOLs or research credits with which to offset the tax benefits from stock options.  BDO told Presstek that if it had recognized sufficient stock compensation tax deductions in the first quarter of 1996 to offset projected 1996 income, it could use an estimated effective tax rate of zero percent.  Accordingly, it need not record a charge in lieu of income taxes in its financial statements for the first quarter of 1996.  Presstek followed BDO's advice.

On April 25, 1996, Presstek issued a press release reporting the results of its operations in the first quarter of 1996.  Revenues for the quarter were reported as $11,000,500, and net income was stated to be $2,059,000 or $.12 per share.  Presstek's first quarter Form 10-Q, filed on or about May 10, 1996, reported the same results.  The financial statements reported that they had been prepared in accordance with generally accepted accounting principles ("GAAP").

4

The advice given to Presstek by BDO in April, 1996, however, was not in compliance with GAAP.  Had Presstek's first quarter financial statements actually been prepared in accordance with GAAP, reported net income would have been approximately $770,000 lower, at $1,289,000 or $.08 per share.  On June 18, 1996, Presstek issued a press release restating the results of its first quarter operations.  The press release reported in part:

> At the conclusion of the first quarter ended March 30, 1996, Presstek's auditors had advised management that it need not record an income tax expense on its financial statements as a result of such deductions. Presstek stated that its auditors, upon further consideration of their earlier advice, have . . . determined that such deductions were not available for financial reporting purposes.[3]

Plaintiffs allege that the financial results Presstek initially reported were false and misleading and that defendants knew, or were recklessly indifferent in not recognizing, that the financial results had not been obtained in accordance with GAAP. Specifically, plaintiffs allege that Presstek and DiBenedetto knew or should have known that BDO's advice with respect to the first quarter 1996 statements was incorrect because it was contrary to the advice Presstek had previously received from BDO and Deloitte.  Plaintiffs contend that because Presstek and DiBenedetto failed to require BDO to explain why its advice was contrary to that previously given, their reliance on that advice could not be reasonable.

_____

[3]As quoted in plaintiffs' Second Consolidated Amended Class Action Complaint at ¶ 199 (emphasis omitted) and corrected for error based on a copy of the press release attached as exhibit G to DiBenedetto's affidavit.

Discussion

In ruling on defendants' separate motion to dismiss, the court dismissed all individual defendants, other than Robert Howard, Robert E. Verrando, and, with respect to the allegations of accounting deficiencies, Glenn J. DiBenedetto. The court also dismissed plaintiffs' state law causes of action other than that pled under New Hampshire's Blue Sky law. This motion for summary judgment as to the accounting allegations deals only with those causes of action and the remaining defendants.

Defendants first argue that plaintiffs fail to allege facts sufficient to plead scienter, as required. On defendants' motion to dismiss, the court held that plaintiffs sufficiently stated a claim as against DiBenedetto relative to the accounting allegations. However, as defendants' motion to dismiss was filed on behalf of individual defendants other than Verrando and Robert Howard, the court did not test the sufficiency of plaintiffs' allegations against them.

Section 10(b) of the Exchange Act requires plaintiffs to plead scienter with enough particularity to satisfy federal Rule of Civil Procedure 9(b). Maldonado v. Dominquez, 137 F.3d 1, 9 (1st Cir. 1998). The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976).

> [The First] [C]ircuit has been clear and consistent in holding that, under section 10(b), plaintiffs must plead specific facts giving rise to a strong inference of fraudulent intent. Courts have

> uniformly held inadequate a complaint's general averment of the defendant's knowledge of material falsity unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was false or misleading.

Maldonado, 137 F.3d at 9 (citation, footnote and internal quotation marks omitted).

> Plaintiffs allege:

> All of the [defendants] knew that, or were recklessly indifferent to the truth that, the Provision for Income Taxes, Net Income and Net Income Per Share figures reported in Presstek's First Quarter 1996 Financial Statements did not present those figures in accordance with GAAP for interim financial statements, but rather grossly overstated the true figures in the manner set forth above.[4]

That conclusory allegation, without more, is obviously insufficient. The only individual defendant alleged to have had any contact with BDO, any understanding as to why the initial advice given by BDO and Deloitte was correct, and any reason to suspect that BDO's later advice was flawed, is DiBenedetto.[5] Plaintiffs' § 10(b) and Rule 10b-5 claims with respect to the accounting allegations are accordingly dismissed as to defendants Verrando and Robert Howard.

As plaintiffs' complaint on its face states a claim against Presstek and DiBenedetto with regard to the accounting allegations, the court next considers whether those allegations can withstand the motion for summary judgment. Defendants argue that DiBenedetto's and Presstek's reliance upon the advice of

---

[4]Compl. at ¶ 186.

[5]See Compl. at ¶¶ 201-208.

Presstek's independent auditor precludes a finding that they had the requisite scienter.  See Newton v. Uniwest Financial Corp., 802 F. Supp. 361, 368 (D. Nev. 1990), aff'd, 967 F.2d 340 (1992). Plaintiffs counter that there are genuine disputes as to material facts, precluding summary judgment, particularly, whether the defendants reasonably and in good faith relied on BDO's advice.

Plaintiffs argue that the record shows that defendants knew or were reckless in failing to learn that BDO's advice was incorrect, and, therefore, defendants' reliance could not have been reasonable or in good faith.  Plaintiffs attempt to shore up their position with portions of DiBenedetto's deposition which, they argue, show that he knew that once the non-compensation NOLs ran out, Presstek would have to record a provision for federal income taxes, just as it had been required to do for state tax purposes.  Read in its entirety, however, DiBenedetto's deposition fails to raise any genuine issue of material fact as to his knowledge of BDO's error.

According to DiBenedetto, in connection with the 1993 financial statements, no one at Deloitte explained to him in detail why Presstek had to record a charge for New Hampshire, but not federal, income taxes.[6]  He was told "[j]ust that New Hampshire has limitations on net operating loss carry-forwards, and that we didn't have adequate net operating loss carry-forwards for New Hampshire purposes, because they limit them."[7]

_____

[6]DiBenedetto dep. at 17-18.

[7]Id. at 18.

8

No distinction as to the type of NOLs (i.e., non-stock-compensation or other NOLs) was made.[8]  With regard to the 1994 financial statements, NOLS were not discussed with respect to federal taxes; Presstek was just advised to make the same kind of provision for New Hampshire taxes as it had the previous year.[9]

DiBenedetto was first made aware of the difference between NOLS derived from stock compensation and other NOLS in early 1996, in connection with preparation of the 1995 financial statements.

> The explanation distinguishing the net operating losses as operating losses that were derived by stock compensation were those that were - Sue Lister [of BDO] explained that there were losses - net operating losses could be composed of losses generated by stock compensation and from operations of the company.  When the company ran out of losses from operations, that they would probably have to book a tax provision similar to the New Hampshire provision with a credit to additional paid-in capital.[10]

Having been informed by BDO that Presstek had used up its non-stock-compensation NOLS in 1995, DiBenedetto directed Presstek's comptroller to ask BDO whether the company now had to record a provision for federal income taxes.[11]  The comptroller reported back that "BDO had suggested that we may not have to record the federal provision if we had adequate stock compensation earned in the current period, namely, the period

---

[8]Id. at 21.

[9]Id. at 27-28.

[10]Id. at 35.

[11]Id. at 40.

being the three months ended March of '96 and she said we did."[12] DiBenedetto asked BDO's Frank J. Pearlman if the same applied to New Hampshire taxes, and was told that it did.[13] He then said to Pearlman: "'So you mean we really shouldn't have been recording that New Hampshire - we didn't really need to be recording that New Hampshire provision if we had had adequate stock comp. in those periods?' I remember the answer coming back, 'Yeah, I guess you're right.'"[14] No one at BDO explained to DiBenedetto why it made a difference whether the stock compensation deductions were from the current or a prior period, other than to say that that was what BDO's research had determined.[15] Nor can DiBenedetto recall asking for an explanation.[16]

Plaintiffs argue that because DiBenedetto understood that some provision had to be made for New Hampshire taxes in 1993, 1994, and 1995, he also knew or should have known that BDO's advice with respect to the financial statements for the first quarter of 1996 was wrong. Plaintiffs rely on the following excerpt from DiBenedetto's deposition:

> Q: Did you come away from that meeting [with auditors from Deloitte] feeling that you understood why a tax provision was going to be made in Presstek's 1993 financial statements with respect to New Hampshire

[12]Id. at 43.

[13]Id. at 48.

[14]Id. at 48-49.

[15]Id. at 59.

[16]Id. at 53, 59.

10

income taxes, but that no provision needed to be made
for federal income taxes?
A: Yes[17]
. . .
Q: . . . And you understood that if . . . [stock option
compensation expense] was the only source of a
deduction to enable Presstek not to pay income taxes,
that a tax provision was required?
A: In New Hampshire.[18]

However, the deposition, read in context, reveals that while
DiBenedetto may well have understood what he was told by the
auditor on one level — i.e. whether Presstek had NOLs it could
use or not — he did not have the depth of understanding or
knowledge plaintiffs would ascribe to him.  Notwithstanding the
quoted testimony,[19] he said a number of times that he did not in
fact understand "that if the source of a deduction on Presstek's
income tax returns was stock option compensation, that a GAAP
adjustment needed to be made."[20]

---

[17]Id. at 18-19.

[18]Id. at 24.

[19]Immediately following his answer, DiBenedetto testified as
follows:
Q: Did you believe that the GAAP treatment of income
tax savings was different depending upon whether it was
state or federal taxes?
A: No, I didn't.  I didn't think about it at all at the
time.  I just had a discussion about a need for a New
Hampshire tax provision.  It was near the end of the
audit.  It was near the time that our numbers would
have to start going into the financial statements and
other things had to be done.  The tax person said that
this is basically something we needed, and it was a
fairly brief meeting and discussion."
Id. at 24.

[20]Id. at 23 (quoted language is plaintiffs' attorney
questioning DiBenedetto about his knowledge in 1993).  See also
id. at 37 (testifying that at the time the 1995 financial
statements were prepared, he did not have "an understanding from

11

Plaintiffs also argue that DiBenedetto should have known that BDO's 1996 advice was wrong because it conflicted with advice he had previously obtained from both BDO and Deloitte. However, DiBenedetto testified that with respect to federal taxes, he did not think the advice conflicted. He was told that when the non-stock compensation NOLs ran out, Presstek might have to record a provision in lieu of taxes. He was later told that there might be a reason, other than having NOLs, why Presstek might not have to record such a provision.[21] Nothing in the record, and nothing offered by plaintiffs, suggests that it was unreasonable for DiBenedetto to fail to recognize an inconsistency in the professional advice he was given by outside and independent auditors.

With respect to New Hampshire taxes, DiBenedetto did see a potential conflict, and he inquired about it. He "made a point to say [to Pearlman] 'So we've been recording this New Hampshire provision, and we probably didn't have to.' and he said, 'Yeah, I guess you're right.'"[22] Thus, DiBenedetto was essentially told that the advice he had been given before 1996 might have been incorrect, and the advice he was then receiving was correct.

---

an accounting point of view as to why under GAAP there would be a tax provision for income tax if the source of the income tax deduction was stock option compensation." (quoted language is plaintiffs' attorney's question)).

[21]Id. at 51-52.

[22]Id. at 50.

Plaintiffs argue that DiBenedetto "should have known" that BDO's 1996 advice conflicted with basic GAAP reasoning in recording the results of a company's operations.  In abbreviated form, plaintiffs' argument is that a company's Statement of Operations is supposed to record only the results of the company's operations.  Proceeds of stock sales, because they are not generated by the company's operations, are not listed as income or revenues in the company's results of operations.  Rather, they are recorded in the Statement of Changes in Stockholders' Equity.

For similar reasons, tax savings from the exercise of non-qualified stock options cannot be recorded on the Statement of Operations as a reduction in the provision for income taxes: such tax savings are not generated from the operations of the company but through the sale of the company's stock.  Since BDO's 1996 advice suggested using stock compensation deductions - deductions not related to the operations of the company - to reduce the provision for income taxes in the Statement of Operations of the company, it violated this basic principle, and the CFO simply should have recognized that fact.

While plaintiff's rationale is plausible, they have not identified any genuine issue of material fact regarding whether DiBenedetto understood their rationale, made the same connections, or had the personal expertise or knowledge to arrive at the same conclusion, or whether in fact he did reach the same conclusions.  DiBenedetto testified that he was first made aware

13

of the different types of NOLs - those derived from stock compensation and those derived from operations of the company - in a conversation with BDO's Sue Lister in connection with Presstek's 1995 financial statements.  However, DiBenedetto still testified that at that time he did not "have an understanding from an accounting point of view as to why under GAAP there would be a tax provision for income tax if the source of the income tax deduction was stock option compensation."[23]

Plaintiffs point out that DiBenedetto was at the time a practicing certified public accountant.  However, presumably so

[23]Id. at 37 (quoted language is plaintiffs' attorney's question).  DiBenedetto did display some understanding when he was carefully walked through the problem by plaintiffs' counsel:
    Q: You did understand that by making a tax provision
    that the earnings statement would be charged the
    expense of those taxes?
    A: Yes.
    Q: And that the, in fact, savings of those taxes would
    be recorded as an increase in the shareholders' equity?
    A: Correct.
    Q: Conceptually did you understand why that was what
    GAAP required?  The logic behind it is really what I'm
    asking you.
    A: I guess only that there was - somehow there was a
    contribution to the company by stockholders, when
    you're using stock as equity.  That was the thought
    process I guess I was thinking.
    Q: You understood that when an employee exercised a
    stock option and accordingly purchased stock, that the
    proceeds that the company received from that purchase
    did not go into the company's statement of operations,
    but went into equity, shareholder's equity, right?
    A: Correct.
Id. at 37-38.  The court does not accept, however, that this testimony demonstrates the level of understanding on DiBenedetto's part that plaintiffs' argument requires.  It shows that plaintiffs' counsel understood the point, and that counsel could draw the point out at deposition, but it does not shed much light on what DiBenedetto knew or appreciated at the critical time when BDO gave its independent advice.

were BDO's Pearlman and Lister, who the court assumes were innocently mistaken in concluding that Presstek could use current period stock compensation deductions to reduce Presstek's effective tax rate on its Statement of Operations to zero. See Duncan v. Pencer, 1996 WL 19043 (S.D.N.Y. Jan 18, 1996) (finding it irrational that a Big Six accounting firm would risk its reputation by "knowingly condon[ing] a client's fraud in order to preserve a fee that, at best, is an infinitesimal percentage of its annual revenues"). If it did not occur to either Pearlman or Lister that such treatment violated a basic principle of accounting for operations, and it apparently did not, the court cannot conclude that plaintiffs having merely juxtaposed the error and DiBenedetto's CPA qualifications and general knowledge, is enough to raise a material issue of fact regarding his actual knowledge at the critical time. There is nothing else in the record that tends to show that DiBenedetto could have been aware of the error.

Finally, plaintiffs contend that DiBenedetto unreasonably failed to ask BDO to explain why its advice had changed or why its previous advice had been wrong and the new advice was correct. However, "[t]he principals of a corporation do not have the duty to personally review the work and conclusions of the professionals employed specifically for this purpose, especially where their knowledge and expertise is minimal in comparison to that of their accountants." Cohen v. Koenig, 918 F. Supp. 719, 727-28 (S.D.N.Y. 1996). DiBenedetto may be a certified public

15

accountant by training, but he plainly stated that he first sought Deloitte's advice on the stock option issue because he "had no experience with these accounting issues or with respect to any interpretations of professional accounting rules and opinions that might be involved, whereas Deloitte had such experience."[24] Plaintiffs have presented nothing that seriously contradicts that evidence. At most, it appears that DiBenedetto might have been remiss in failing to ask for further explanation, but oversight, or even negligence, is not scienter. See Securities and Exchange Commission v. Steadman, 967 F.2d 636, 642 (D.C. Cir. 1992).

Plaintiffs have failed to identify any genuine dispute as to a material fact regarding DiBenedetto's actual knowledge that BDO's advice was incorrect, or his alleged reckless disregard of the fact that its advice might have been incorrect. Plaintiffs have not presented any facts or evidence from which it could be found that DiBenedetto or Presstek knew or reasonably should have known that the financial information Presstek was disseminating to the public was materially false or misleading. In other words, plaintiffs have not shown that DiBenedetto or Presstek could have acted with scienter. Schaffer v. Timberland Co., 924 F. Supp. 1298, 1314 (D.N.H. 1996). And, plaintiffs have also failed to identify any genuine dispute as to any material fact regarding whether DiBenedetto's and Presstek's reliance on BDO's advice was reasonable and in good faith; from the undisputed

---

[24]DiBenedetto aff. at ¶ 4.

16

material facts of record it could not be found to have been other than reasonable and in good faith. Summary judgment in favor of defendants on this issue is appropriate.

Defendants also argue that plaintiffs' state law claims should be dismissed. Plaintiffs' state law claims for fraud and negligent misrepresentation were dismissed on defendants' earlier motion. With respect to plaintiffs' New Hampshire Blue Sky Law claims, defendants argue that New Hampshire's Blue Sky "statute is limited jurisdictionally as to privity and with respect to offers to sell or buy that were made or accepted within this state."[25] The court will indulge the argument by construing it as suggesting that plaintiffs' Blue Sky Law claims should be dismissed for failure to plead either privity, or that the requisite actions occurred in New Hampshire.

Plaintiffs point out that there is no privity requirement under N.H. RSA 421-B:25(II)(1998), which provides, in part, that "any person who violates RSA 421-B:5 in connection with the purchase or sale of any security shall be liable to any person damaged by the conduct proscribed by RSA 421-B:5." In addition, N.H. RSA 421-B:30(VI)(1998) provides that RSA 421-B:5 applies "when any act instrumental in effecting prohibited conduct is done in this state, whether or not either party is then present in this state." Plaintiffs argue that because Presstek's principal executive offices are in New Hampshire, any public statements issued by it are deemed to have been issued in New

_____

[25]Defendants' brief at 28 (citation omitted).

17

Hampshire.  For the reasons argued by plaintiffs, defendants'
motion for summary judgment is denied as to plaintiffs' Blue Sky
Law claims, without prejudice.

<u>Conclusion</u>

For the foregoing reasons, defendants' renewed motion for
summary judgment (document no. 129) is granted as to plaintiffs'
claim regarding the accounting allegations, and denied as to
plaintiffs' Blue Sky Law claims.


**SO ORDERED.**


_____
Steven J. McAuliffe
United States District Judge

March 30, 1999

cc:  Edward F. Haber, Esq.
     George R. Moore, Esq.
     Patricia I. Avery, Esq.
     Kevin E. Sharkey, Esq.
     Paul D. Young, Esq.
     Mark L. Mallory, Esq.
     Patricia D. Howard
     Solomon Cera, Esq.
     Barrie L. Brejcha, Esq.
     Kenneth A. Cossingham, Esq.
     Thomas J. Pappas, Esq.
     R. Bruce McNew, Esq.